2001–NMCA–029

23 P.3d 936

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Sandra NEMETH, Defendant–Appellant.**

No. 20,637.

Court of Appeals of New Mexico.

April 20, 2001.

Patricia A. Madrid, Attorney General, Margaret E. McLean, Assistant Attorney General, Santa Fe, NM, for Appellee.

Glenn Smith Valdez, Glenn Smith Valdez Law Office, Albuquerque, NM, for Appellant.

## OPINION

SUTIN, Judge.

{1} In this appeal we address the issue whether a non-consensual warrantless entry by police officers into a private residence on a possible suicide call is constitutionally permissible under a community caretaker doctrine. We also examine whether the entry, which preceded a battery on one of the police officers, was within the lawful discharge of a police officer's duties.

{2} Defendant Sandra Nemeth appeals a jury's verdict finding her guilty of battery upon a peace officer occurring in Defendant's home after the officers' warrantless entry. Defendant argues that the trial court erred in denying her motion to dismiss or, in the alternative, to suppress evidence relating to the alleged battery, and in refusing her tendered jury instructions. We hold the police officers' actions to be constitutional under the Fourth Amendment, consistent with the New Mexico Constitution, and within the lawful discharge of their duty.

## BACKGROUND

{3} Mike Wells, whom Defendant had been dating, called 911 to report that Defendant had just threatened to harm herself in the course of an argument with him. The dispatcher asked Officer Lori Phelps of the Aztec police department to investigate a possible suicide attempt. Deputy Terry Eagle of the San Juan County sheriff's department heard the call and volunteered to assist.

{4} Eagle arrived at Defendant's home and switched on his video camera. The camera recorded the scene outside of the home. Through a microphone attached to his uniform, Eagle also recorded portions of the conversations that occurred, both inside and outside of the house.

{5} The house was dark with no sign of activity inside. Eagle knocked at the door several times but no one responded. There were keys on the front porch attached to a note that read, "These keys belong to Mike Wells." Eagle walked around the house, knocking on windows and doors, but received no response.

{6} When Phelps arrived, Eagle informed her of the note and told her no one appeared to be home. Phelps observed a person looking out of one of the windows. The officers again knocked on the door and said, "Ma'am, we know you're in there. You need to open the door please." Defendant opened the door briefly and while crying told the officers, "Go, please just go." Eagle testified that Defendant appeared very distraught and emotional. The officers continued to knock and to ask to speak with Defendant.

{7} Defendant again opened the door and yelled at the officers to "fucking leave me alone." She tried to shut the door but Eagle stuck his foot in the opening. Defendant protested and told the officers she was not a danger to herself or to anyone. Phelps forced her way into Defendant's home.

{8} The officers testified that they entered Defendant's home because they were concerned about her welfare. Eagle testified that preservation of life is his most important duty as a certified police officer and that he would not have been performing his duty had he just walked away from the door when Defendant shut it. Phelps testified that she was concerned for Defendant's safety. She also testified she felt that she had a duty to preserve life.

{9} Defendant told the officers to leave unless they had a warrant. The officers explained they were there to check on Defendant's welfare because someone had called who was worried about her. Defendant shouted that nobody cared about her.

{10} The officers requested identification but Defendant refused. She moved into her kitchen and shouted at the officers "Get out of my fucking house." She also shouted "I'm fine, I'm pissed[,] get out of my house."

{11} The officers moved toward Defendant. Defendant continually told the officers to leave, and backed up until she stood near a kitchen counter. On the counter were a large knife and a small paring knife. Defendant picked up the small paring knife and again told the officers to get out. It is disputed whether Defendant stepped toward the officers. Phelps drew her gun and held it in a low, ready position. Eagle ordered Defendant to put the knife down, and she complied.

{12} Defendant told the officers her boyfriend (Wells) was on the phone. Eagle talked with him briefly. Wells gave Defendant's name to Eagle.

{13} Defendant, sobbing and emotional, continued to tell the officers to leave her house. With her driver's license and other identification cards in hand, she approached Phelps. Defendant shouted "Eat this, bitch" and shoved the cards into Phelps's mouth, causing a small cut and some swelling. At that point, five and one-half minutes had passed since Defendant first opened the door and a little less than three minutes since the officers entered Defendant's home. Defendant moved to another room and, after further interaction between the officers and Defendant not relevant to this appeal, Defendant was arrested.

{14} The recording reveals that the officers' voices throughout were polite and calm, but firm. Defendant was upset and yelling most of the time, with the exception of a brief period of less than a minute in the middle of the tape when her voice temporarily calmed.

{15} Defendant was charged by criminal information with two counts of aggravated assault on a peace officer, two counts of battery on a peace officer, attempting to disarm a peace officer, and battery on a household member. Defendant's motion to suppress was denied and the case was tried to a jury. The jury returned a verdict of guilty on one count of battery on a peace officer and on the misdemeanor charge of battery on a household member. Defendant appeals the denial of the motion to suppress and the verdict of guilt as to battery on a peace officer.

## DISCUSSION

### The Warrantless Entry Into Defendant's Residence

{16} Defendant contends that the officers' warrantless entry into her home was in violation of the Fourth Amendment to the United States Constitution and Article II, § 10 of the New Mexico Constitution. She argues that the warrantless entry requires suppression of all evidence of the peace officer battery, because the evidence was derived from an unconstitutional entry into her home.

{17} Defendant also argues that Phelps was not "in the lawful discharge" of her duties, as required under NMSA 1978, § 30–22–24(A) (1971): "Battery upon a peace officer is the unlawful, intentional touching or application of force to the person of a peace officer while he is in the lawful discharge of his duties, when done in a rude, insolent or angry manner."

{18} It is undisputed that the officers lacked both consent and a warrant to enter Defendant's home. However, it is also undisputed that the officers' entry into the home was not based on any suspicion of criminal activity and did not involve a criminal investigation but, rather, was solely in response to a report that Defendant may be suicidal. Defendant does not challenge the officers' motivation in responding to that report.

### A. Defendant's Motion to Suppress

{19} Defendant's motion to suppress all evidence of the felony battery was based on the legal argument that, because Phelps did not have a warrant to enter Defendant's home making the entry unlawful under the Fourth Amendment and the New Mexico Constitution, all evidentiary fruits of that poisonous tree must be suppressed.

### 1. Standard of Review

{20} Resolution of the issue requires us to determine whether the actions of the police officers implicate a constitutional right and whether those actions fall within an exception to that right. We determine whether the law was correctly applied to the facts, giving deference to the "purely factual assessments" of the trial court. *State v. Atta-*

*way,* 117 N.M. 141, 144–46, 870 P.2d 103, 106–08 (1994). We review the trial court's application of law de novo. *Id.*

**2. The Community Caretaking Doctrine in New Mexico**

■ {21} In this case, the officers were acting pursuant to a 911 call regarding a possible suicide threat. They were motivated solely to check on a person's welfare and to assist a person in need. They were not engaged in any sort of criminal investigative activity. These actions fall within a police officer's community caretaker function, which is, broadly stated, to render aid and assistance to those in need.

{22} The community caretaker doctrine appears to have taken first New Mexico root in a case involving the stop of a vehicle, *State v. Reynolds,* 117 N.M. 23, 24–25, 868 P.2d 668, 669–70 (Ct.App.1994), *rev'd on other grounds,* 119 N.M. 383, 890 P.2d 1315 (1995). The police stopped a moving pickup truck for safety reasons, when three passengers were sitting on the tailgate. The police detained the vehicle to check driver's license and registration, following which the police arrested the defendant for car theft. We stated: "Part of the function of police officers is to carry out community caretaking functions to enhance public safety." 117 N.M. at 25, 868 P.2d at 670. Our introduction of the community caretaking function was based on *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), which established a community caretaker exception to the Fourth Amendment in a circumstance of police-citizen contact involving automobiles. *Id.* at 441, 93 S.Ct. 2523. In its reversal of our decision in *Reynolds,* the New Mexico Supreme Court acknowledged the community caretaker function. 119 N.M. at 388, 890 P.2d at 1320.

{23} While *Reynolds* was pending before the New Mexico Supreme Court, we decided *Apodaca v. State Taxation & Revenue Dep't, Motor Vehicle Div.,* 118 N.M. 624, 884 P.2d 515 (Ct.App.1994). In *Apodaca,* the police observed a motorcycle weave within its lane of travel and stopped the driver out of concern for the driver's welfare. The officer then made observations that caused him to arrest the driver for driving while intoxicated. *Id.* at 625, 884 P.2d at 516. Referring to our *Reynolds* opinion, we stated that we "recently held that a police officer may stop a vehicle for a specific, articulable safety concern, even in the absence of reasonable suspicion that a violation of law has occurred or is occurring." *Apodaca,* 118 N.M. at 626, 884 P.2d at 517. We held that such "a stop is justified by the officer's role as a community caretaker." *Id.*

{24} Following *Apodaca* and *Reynolds,* we held another police officer's contact with a vehicle and its driver to be pursuant to the officer's community caretaker function. *State v. Walters,* 1997–NMCA–013, ¶¶ 10, 22, 123 N.M. 88, 934 P.2d 282. The officer followed a vehicle as it turned from a U.S. highway onto a rural road. *Id.* ¶ 2. The driver, not knowing that the car behind him was a police car, thought that the driver of the car behind him " 'wanted the road' and might be impaired" and pulled off the road. *Id.* ¶¶ 4–5. The officer pulled over behind the vehicle, approached it, and asked the driver why he stopped, detecting the odor of alcohol on the driver's breath. *Id.* ¶¶ 5–6.

{25} In *Walters,* we stated that "community caretaking encounters" are one of three types of police-citizen interactions, the other two being "arrests, which require probable cause, ... [and] investigatory stops, which require reasonable suspicion." *Id.* ¶ 10. Citing *Cady v. Dombrowski,* we explained that while arrests and investigative stops are "seizures, invoking constitutional protections," the community caretaking encounter is a "voluntary encounter, involving no coercion or detention; it thus falls outside the Fourth Amendment." *Walters,* 1997–NMCA–013, ¶ 10, 123 N.M. 88, 934 P.2d 282. This broad statement was approved in dictum by the New Mexico Supreme Court in *State v. Jason L.,* 2000–NMSC–018, ¶ 14, 129 N.M. 119, 2 P.3d 856, in a statement of even greater breadth: "community caretaking encounters are consensual, beyond the scope of the Fourth Amendment." *Id.*

■ {26} The case now before us causes us to consider the community caretaker doctrine in a context different than police-citizen

vehicle encounters. Before we do so, however, we must clarify what appear to be ambiguities in our case law. Following *State v. Lopez*, 109 N.M. 169, 783 P.2d 479 (1989), *Walters* implies that community caretaking encounters are themselves one of the three types of police-citizen encounters and that such encounters do not implicate the Fourth Amendment. *Lopez*, however, does not mention the community caretaker doctrine. It is therefore hard to see how *Lopez* supports the statement in *Walters* or its apparent broadening in *Jason L.* In fact, the community caretaking encounter may or may not fall within the type of police-citizen encounters characterized in *Lopez* as "non-coercive . . . during which the individual approached [by the officer] is free to leave." *Lopez*, 109 N.M. at 171, 783 P.2d at 481. Whether it does depends on the facts. In *Walters*, it did, but not because all community caretaking encounters are non-coercive. It did because the particular facts there were non-coercive. Walters did not know the vehicle following him was a police vehicle and stopped for his own reasons; the police vehicle did not block him in; the use of flashing lights under the circumstances was for safety concerns so as not to unduly alarm Walters. *Walters*, 1997–NMCA–013, ¶¶ 15, 17, 20, 123 N.M. 88, 934 P.2d 282..

{27} While some police-citizen encounters may be beyond its scope because they are non-coercive, such as the encounter in *Walters*, it is clear that many community caretaker actions can and do implicate the Fourth Amendment. Indeed, in *Cady v. Dombrowski*, on which our discussions in *Reynolds*, *Apodaca*, and *Walters* are based, the United States Supreme Court carved out an exception to the Fourth Amendment to validate police community caretaker activity. *Cady*, 413 U.S. at 441, 93 S.Ct. 2523.

{28} At this time, New Mexico community caretaker case law is limited to police-citizen vehicle encounters in which the officer's specific, articulable concern is for the safety of occupants of the vehicle, not the violation of law. In none of the cases did the court specifically analyze whether the particular activity at issue actually implicated the Fourth Amendment. Although *Reynolds*, *Apodaca*, and *Walters* stem from *Cady*, they do not specifically analyze or conclude whether a specific activity comes within the *Cady* community-care exception to the Fourth Amendment. Nor has any New Mexico case involved, as does the case before us, the entry into an individual's home to render emergency assistance.

{29} The issue before us is one of first impression, for which we find little guidance from our existing case law except a recognition in New Mexico of a community caretaking function of police officers requiring a specific, articulable concern for the safety of another that does not involve a law enforcement purpose. We do, however, find the following policy statement from *Reynolds* insightful: " '[I]n a community caretaker case, reasonableness is determined by balancing the public need and interest furthered by the police conduct against the degree of and nature of the intrusion upon the privacy of the citizen.' " *Reynolds*, 119 N.M. at 388, 890 P.2d at 1320 (quoting *State v. Ellenbecker*, 159 Wis.2d 91, 464 N.W.2d 427, 428 (1990)).

{30} With this background, we turn to the case before us with particular focus on police entry into a person's home. For it is the home that represents the one place above all where privacy must be safe-kept from unreasonable intrusion. We must therefore direct our careful vigilance to guard against unreasonable law enforcement intrusion into the home and to permit intrusion only in carefully thought-through and clearly justifiable circumstances.

{31} The United States Supreme Court has made it clear that intrusion into the privacy and sanctity of the home by police officers is a "grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance." *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). Such intrusion "must be strictly circumscribed." *Payton v. New York*, 445 U.S. 573, 582 n. 17, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The Fourth Amendment applies "to all invasions on the part of the government and its employés of the sanctity of a man's home and the privacies of

life." *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886). The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States Dist. Ct.,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). We must, therefore, conscientiously pause and carefully reflect on any circumstances under which we might "disregard the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic." *Payton,* 445 U.S. at 601, 100 S.Ct. 1371; *see also Oliver v. United States,* 466 U.S. 170, 178–79, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) (reiterating the *Payton* language and emphasizing that it is primarily the sanctity of the home that the "[Fourth] Amendment is intended to shelter from government interference or surveillance").

### 3. The Home and the Community Caretaking Function

{32} Cases from other jurisdictions involving law enforcement activity limited to persons in apparent need of aid or assistance have characterized the activity in different ways. Some cases use the words "community caretaker," some "emergency aid or assistance," and others "exigent circumstances." The different characterizations are essentially of the same activity, namely, a community caretaker function.

{33} The "community caretaker" doctrine has taken root in state courts in circumstances other than those involving automobiles or street encounters. *E.g., Wood v. Commonwealth,* 27 Va.App. 21, 497 S.E.2d 484, 487 (1998) (noting that the United States Supreme Court "has yet to decide whether a situation might exist that would justify a warrantless intrusion into an individual's home under the 'community caretaker' doctrine, as distinguished from an emergency or exigent circumstances"); *People v. Ray,* 21 Cal.4th 464, 88 Cal.Rptr.2d 1, 981 P.2d 928, 931, 938 (1999) (stating warrantless entry into home out of concern for welfare of people who may be inside may be lawful under community caretaking doctrine based on report that door was open all day and the home was " 'all a shambles inside' "); *City of Troy*

*v. Ohlinger,* 438 Mich. 477, 475 N.W.2d 54, 56–57 (1991) (stating entry into defendant's home to see if assistance was required justified police investigation as part of the community caretaking function upon seeing defendant bleeding and not moving).

{34} An "emergency aid or assistance" exception to the Fourth Amendment exists in various federal and state jurisdictions. *E.g., United States v. Brown,* 64 F.3d 1083, 1086 (7th Cir.1995) (involving entry into apartment out of concern for occupant's safety); *United States v. Moss,* 963 F.2d 673, 678 (4th Cir.1992) (holding entry must be based on a "reasonably perceived 'emergency' requiring immediate entry as an incident to the service and protective functions of the police"); *State v. Carlson,* 548 N.W.2d 138, 140–42 (Iowa 1996) (involving entry into defendant's home under circumstances a reasonable person would have thought an emergency existed); *Duquette v. Godbout,* 471 A.2d 1359, 1362 (R.I.1984) (forcing door open to enter apartment was justified under "the so-called exigent-circumstances or emergency exception to the probable-cause and warrant requirements of the Fourth Amendment," when an officer has "a reasonable belief that his assistance is required to avert a crisis"); *State v. Fisher,* 141 Ariz. 227, 686 P.2d 750, 760–62 (Ariz.1984) (holding lawful entry into apartment to check if occupants were victims whose lives could be saved); *State v. Boggess,* 115 Wis.2d 443, 340 N.W.2d 516, 522 (1983) (holding lawful entry of home based on anonymous tip alerting authorities to possible child abuse).

{35} Various writers and courts have discussed the similarities and differences among an emergency aid or assistance doctrine, a community caretaker doctrine, and, as well, an exigent-circumstances doctrine. *E.g., Sheik-Abdi v. McClellan,* 37 F.3d 1240, 1243–44 (7th Cir.1994) (stating that "exigent circumstances [is] a concept that is relevant only to whether the officers had authority to *enter* the premises *for the purpose of arrest or seizure,*" and discussing warrantless entry in emergency situations not involving arrest or search); *People v. Davis,* 442 Mich. 1, 497 N.W.2d 910, 914–21 (1993) (stating that rendering aid to persons in distress under the

emergency aid exception "is one of the caretaking functions of the police," which is not to "be confused with the exigent circumstances exception"); *Ray*, 88 Cal.Rptr.2d 1, 981 P.2d at 933 (stating "the emergency aid doctrine is not a subcategory of the exigent circumstances exception" but rather a subcategory of community caretaker exception, "a distinctly different principle of Fourth Amendment jurisprudence"); Naumann, *The Community Caretaker Doctrine: Yet Another Fourth Amendment Exception*, 26 Am. J.Crim. L. 325 (Spring 1999) (categorizing the community caretaker doctrine as encompassing the emergency aid doctrine, the automobile impoundment/inventory doctrine, and the 'public servant' doctrine); 3 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 6.6, at 390–400 (3d ed. (1996) and Suppl. (2000)) (categorizing the "infinite variety of situations in which entry for the purpose of rendering aid is reasonable" under a heading, "To aid person in need of assistance").

{36} A response by law enforcement officers to a call seeking assistance in regard to a possible suicide inside a home can be characterized both as the rendering of emergency aid or assistance and the rendering of assistance out of a concern for a person's safety and welfare. The activity falls within a more generic community caretaking function. The primary characteristic of community caretaking that sets this function apart from criminal investigative and enforcement activity is the absence of concern about violations of law on the part of the law enforcement officer. As long as the facts of a particular case meet the test for the community caretaking function that we set out below, that function can properly take its place in our jurisprudence as an exception to the Fourth Amendment warrant requirement.

### 4. The Test for the Community Caretaking Function

{37} Intrusion into a home acting in a community caretaker capacity is governed by the Fourth Amendment and its fundamental and underlying principle of reasonableness. The test of legitimacy under the community caretaker doctrine is whether the officers' actions were objectively reasonable and in good faith. More particularly, the officer must have a reasonable and articulable belief, tested objectively, that a person is in need of immediate aid or assistance or protection from serious harm. *See Carlson*, 548 N.W.2d at 140–42; *Commonwealth v. Waters*, 20 Va.App. 285, 456 S.E.2d 527, 530 (1995); *Davis*, 497 N.W.2d at 921.

{38} The good faith aspect of this test means that the officer's entry cannot be pretextual, i.e., entry for the purpose of investigating possible criminal activity or obtaining incriminatory evidence, rather than pursuant to a non-criminal-related community caretaking function. *See Sheik-Abdi*, 37 F.3d at 1245; *Ray*, 88 Cal.Rptr.2d 1, 981 P.2d at 937–38; *Waters*, 456 S.E.2d at 530. The Fourth Amendment exception permitting warrantless entry into a home in the performance of community caretaking functions can be invoked only "when the police are not engaged in crime-solving activities." *Davis*, 497 N.W.2d at 920. Furthermore, "the entry must be limited to the justification therefor, and the officer may not do more than is reasonably necessary to determine whether a person is in need of assistance, and to provide that assistance." *Id.* at 921. The entry and activity in the dwelling "must be suitably circumscribed to serve the exigency which prompted it." *Ray*, 88 Cal. Rptr.2d 1, 981 P.2d at 937 (citation and internal quotation marks omitted). However, "[o]nce the veil of the home has been legally pierced, we see no need for police officers to turn a blind eye to crime, so long as the arrest is otherwise effected in compliance with the constitutional requirement of probable cause (and any other relevant state law criteria)." *Sheik-Abdi*, 37 F.3d at 1245.

### 5. The Result: The Conduct Here Passes the Test

{39} In denying Defendant's motion to suppress, the trial court found that the officers had probable cause to enter Defendant's home, that all of the surrounding circumstances supported the officers' reasonable belief that Defendant was or might be suicidal, that none of those circumstances

would dispel a reasonable person's belief that Defendant was suicidal, and that the officers' actions were reasonable. These determinations follow from the facts, and we see no basis to conclude that any is erroneous. While the court did not specifically mention the community caretaker doctrine in its order denying Defendant's motion to suppress, we think that the court's conclusion was completely consistent with and supported by that doctrine.

{40} The officers' actions constituted a check on the welfare of a person the officers reasonably believed to be in need of immediate assistance, and a reasonable, limited effort to determine if they could assist that person. This is a public service that fits squarely within a police officer's community caretaking function. A warrantless entry into a home that passes the community caretaker test is an exception to the Fourth Amendment. Therefore, no warrant to enter Defendant's home was required. The trial court here did not err in denying Defendant's motion to suppress.

{41} Of course, law enforcement officials have no carte blanche to enter homes to investigate circumstances of suspected criminal activity under a guise or pretext of community caretaking pursuits. Our application here of the community caretaker doctrine carries with it the expectation that law enforcement officers will continue to carry on such service, while at the same time remain subject to judicial scrutiny to assure that their actions are reasonable and not pretextual, and that their conduct is not outside the bounds of legitimate community caretaker activity.

### 6. Defendant's Related Points on Wrongful Entry

{42} We briefly address other points raised by Defendant with respect to the warrantless entry.

{43} The State argued below that the officers' entry was justified as an appropriate response to a mental health emergency under NMSA 1978, § 43–1–10(A)(3) (1989) (permitting the detention of a person for emergency mental health evaluation and care "in the absence of a legally valid order from the court"). On appeal, Defendant argues that the State cannot justify the entry on this basis, citing *Pino v. Higgs,* 75 F.3d 1461, 1468 (10th Cir.1996), which held that the Fourth Amendment was implicated when officers detained and transported the plaintiff for mental health evaluation pursuant to Section 43–1–10(A)(3). *Pino,* 75 F.3d at 1468–69. The officers here were not acting pursuant to Section 43–1–10. *Pino* is not applicable because it is limited to whether the officers had authority under Section 43–1–10(A)(3) to detain and transport Pino "once they had reasonable grounds" to do so. *Id.* at 1468. *Pino* does not address the issue whether the officers were performing a community caretaker function permitted under the Fourth Amendment.

{44} Again citing *Pino,* Defendant asserts that the officers were not acting in lawful discharge of their duties. She argues that they lacked probable cause to enter the home because they had no training or experience handling emotionally distraught, suicidal people, and thus had no reasonable basis on which to enter. We find no merit in this assertion.

{45} The entry was constitutionally palatable under the community caretaker doctrine and did not require Fourth Amendment probable cause. *Carlson,* 548 N.W.2d at 142; *Davis,* 497 N.W.2d at 918. The officers were not on a mission to detain Defendant or transport her to any institution or health care facility. They were not acting pursuant to Section 43–1–10 and needed no particular training or experience in how to deal with potential suicide cases to determine if they could be of some assistance to Defendant. Whether or not probable cause in a constitutional sense may be required for entry under Section 43–1–10, it was not required in the present case.

{46} Defendant asks this Court to provide greater protection to her under Article II, § 10 of the New Mexico Constitution if we determine that the entry was lawful under Fourth Amendment law. *See State v. Gomez,* 1997–NMSC–006, ¶ 19, 122 N.M. 777, 932 P.2d 1 (setting out the interstitial approach to constitutional analysis required as

a condition precedent to invoking greater protection under Article II, § 10 than that provided under the Fourth Amendment). She contends that New Mexico has a higher standard for determining probable cause and argues the necessity of a more substantial basis for entry than the boyfriend's telephone call here. *See State v. Cordova,* 109 N.M. 211, 217, 784 P.2d 30, 36 (1989) (holding informant's affidavit insufficient to establish probable cause). She argues that the application of New Mexico's higher probable cause standard, notwithstanding the police officer's good faith, will result in either dismissal of this case or suppression of the evidence on which her conviction was based. *See State v. Gutierrez,* 116 N.M. 431, 446–47, 863 P.2d 1052, 1067–68 (1993) (rejecting good faith exception to exclusionary rule).

{47} If this case involved a criminal investigation or a detention under NMSA 1978, § 43–1–10(A)(3) (authorizing the officers to detain and transport persons for mental health evaluation), we might agree to review and analyze this argument. However, probable cause was not required under the facts of this case. Therefore, we are not required to determine whether the police officers had probable cause. Rather, we determine whether the police officers acted properly in their community caretaking function. The community caretaker doctrine that we apply here is an exception to the Fourth Amendment and compatible with the New Mexico Constitution.

{48} Defendant also contends that it is simply "fundamentally unjust" to allow police officers who are untrained in psychology or psychiatry to forcibly enter the home of a citizen to evaluate the danger of his or her mental condition. To permit entry, Defendant argues, requires a "logic [that] would rob the constitution of all efficacy" by allowing "the government in the role of counselors" to invade our private lives.

{49} We, of course, must be ever mindful of the risk that government mental health counselors or police officers might overstep the bounds of the Fourth Amendment to enter a home. In this case though, we have no question that the officers acted reasonably and in good faith in an emergency context to check on Defendant's welfare and to render aid or assistance if appropriate. The resulting intrusion is entitled to protection from Fourth Amendment attack.

**Defendant's Proposed Jury Instructions**

{50} Defendant contends that the trial court erred when it refused to give four of her tendered jury instructions. We review the refusal to give a jury instruction de novo. *State v. Lucero,* 1998–NMSC–044, ¶ 5, 126 N.M. 552, 972 P.2d 1143.

### A. Proposed Lawful Discharge of Duties Instruction

{51} Defendant contends that the jury was not properly instructed on an essential element of the offense of battery upon a police officer. Failure to instruct on an essential element of an offense is reversible error. *State v. Peterson,* 1998–NMCA–049, ¶ 9, 125 N.M. 55, 956 P.2d 854.

{52} The trial court used an instruction that tracks the language of UJI 14–2211 NMRA 2001. The specific element in that instruction the State was required to prove reads: "At the time, Lori Varnell (Phelps) was a peace officer and was *performing the duties* of a peace officer." (Emphasis added.) In contrast, the statutory definition of battery on a police officer uses the phraseology, "while [the peace officer] is in the *lawful discharge of his duties.*" Section 30–22–24 (emphasis added).

{53} Defendant's proposed instruction read: "In addition to the other elements in count 3[,] the State must also prove to your satisfaction and beyond a reasonable doubt that officer Phelps was in the lawful discharge of her duties at the time of the alleged offense." Defendant complains that the instruction given did not use the words of the statute, "lawful discharge of his duties," and that her proposed instruction correctly contains those words.

{54} We find no merit in Defendant's contention that the instruction was missing an essential element because the instruction did not contain the words, "lawful discharge of his or her duties." "The standard for determining whether an officer was

acting within his or her lawful discharge of duties is whether the officer was performing his or her official duties." *State v. Tapia*, 2000–NMCA–054, ¶ 13, 129 N.M. 209, 4 P.3d 37. In UJI 14–2211, our Supreme Court merely replaced the words "lawful discharge of his duties" with a definition of those words, namely, "performing his or her official duties." *Id.* It was not necessary to use the word "lawful" in the instruction. *Id.* ¶ 18 (stating that irrelevant words for insertion in a proposed instruction may be refused).

{55} In *Tapia*, this Court said that "the officer is performing official duties if the officer is acting in good faith and within the scope of what the officer is employed to do." *Id.* ¶ 13. Thus, the more complete and meaningful definition of "lawful discharge of his duties" is more expansive and detailed than merely "performing his or her official duties." From *Tapia*, the definition in its entirety should read: an officer is acting in the lawful discharge of his or her duties when the officer is acting in good faith and within the scope of what the officer is employed to do. We find it noteworthy, therefore, that while the phrase "within the scope of what the officer is employed to do" is a fair statement of "performing his or her official duties," the phrase "acting in good faith" adds an element not in UJI 14–2211 and therefore not in the instruction given in the present case.

{56} We do not now decide the issue whether the State must prove (and the instruction must therefore say) that the officer was acting in good faith in order to prove battery upon a police officer, however, because Defendant did not propose an instruction containing that element and did not raise this issue in her briefs on appeal. Nor has Defendant sought a determination of fundamental error based on an argument that "reasonable juror[s] would have been confused or misdirected by the jury instruction." *State v. Cunningham*, 2000–NMSC–009, ¶ 14, 128 N.M. 711, 998 P.2d 176 (internal quotation marks omitted). Further, Defendant's objection to the instruction is not that the definition of "lawful discharge of his duties" was incomplete. Rather, her objection complains of the use of a definition of

lawful discharge rather than using the exact statutory language "lawful discharge." Finally, as we indicated above, there was no issue concerning the officers' good faith motivation in responding to Mr. Wells' report. *See State v. Orosco*, 113 N.M. 780, 783, 833 P.2d 1146, 1149 (1992) (limiting fundamental error doctrine to a failure to instruct on elements that are "in issue").

{57} We therefore hold that the trial court did not commit error in refusing Defendant's requested jury instruction seeking the use of the words "lawful discharge of his duties" instead of "performing the duties of a peace officer."

## B. Proposed Lesser–Included Battery Offense Instruction

{58} Defendant contends that the trial court erred in refusing Defendant's tendered instruction that set out the elements of the offense of battery. *See* UJI 14–6002 NMRA 2001. Given evidence to support it, the offense of battery is a lesser offense within the offense of battery upon a peace officer. *See State v. Melendrez*, 91 N.M. 259, 261, 572 P.2d 1267, 1269 (Ct.App. 1977).

{59} Defendant must show that the offense of battery is the highest degree of crime committed. *See State v. Salazar*, 1997–NMSC–044, ¶ 50, 123 N.M. 778, 945 P.2d 996; *State v. Diaz*, 121 N.M. 28, 30, 908 P.2d 258, 260 (Ct.App.1995) (stating the elements required for giving a lesser-offense jury instruction). The trial court must give the lesser-included offense instruction if there is a "plausible view," *State v. McGruder*, 1997–NMSC–023, ¶ 14, 123 N.M. 302, 940 P.2d 150; or, a "reasonable view," *State v. Baca*, 1997–NMSC–059, ¶ 33, 124 N.M. 333, 950 P.2d 776, that the lesser crime "could have been the highest degree of crime committed." *Id.* The instruction should be given if the jury could have found that the defendant committed the lesser offense. *See Salazar*, 1997–NMSC–044, ¶ 50, 123 N.M. 778, 945 P.2d 996,.

{60} Here, it is lawful discharge of duty that is the distinguishing element between the offenses of battery and battery upon a

police officer. Defendant contends that a fact issue exists whether Phelps's entry was in the performance of her duties as a police officer. Defendant asserts that the jury could have found that Phelps's entry was not in the performance of her duties as a police officer.

{61} Defendant's sole evidence regarding the lawful basis for the officers' entry into Defendant's home was the officers' failure to have a warrant. This evidence is not relevant, because the issue of warrantless entry is not relevant in this case. The undisputed evidence was that the entry was pursuant to a legitimate community caretaking function. Therefore, Defendant failed to show evidence creating either a plausible or a reasonable view that Phelps was outside the scope of her duties or not acting in the performance of her duties when she entered Defendant's home.

{62} We hold that the trial court did not commit error in refusing Defendant's requested lesser-included battery instruction.

### C. Proposed Self–Defense and Defense of Property Instructions

 {63} Defendant contends that the trial court erred in refusing to give her tendered jury instructions on self-defense, based on UJI 14–5181 NMRA 2001, and on defense of property, based on UJI 14–5180 NMRA 2001. She argues that under Article II, § 4 of the New Mexico Constitution, she had a natural, inherent, and inalienable right to defend her property against intrusion by the officers and was permitted to use the force she did against Phelps because the officers entered her home without a warrant.

{64} Defendant asserts that these instructions should have been given because there exists sufficient evidence, even if slight, on which reasonable minds may differ. *State v. Lopez*, 2000–NMSC–003, ¶ 23, 128 N.M. 410, 993 P.2d 727; *State v. Branchal*, 101 N.M. 498, 500, 684 P.2d 1163, 1165 (Ct.App.1984). But Defendant did not present evidence warranting self-defense and defense of property instructions. No reasonable jury could find that shoving cards into Phelps's mouth was an act of self-defense or in defense of property. Furthermore, Phelps was not using any force at the time, much less unnecessary force. *State v. Kraul*, 90 N.M. 314, 319, 563 P.2d 108, 113 (Ct.App.1977) (holding that self-defense is a limited defense to battery upon a police officer, in that "[o]ne does not have the right to self-defense when the officer is using necessary force to effect an arrest").

### CONCLUSION

{65} The trial court did not err in denying Defendant's motion to dismiss or to suppress, and did not err in refusing Defendant's tendered instructions. We therefore affirm.

{66} **IT IS SO ORDERED.**

WE CONCUR: LYNN PICKARD, Judge, and M. CHRISTINA ARMIJO, Judge.