COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judges Elder and Humphreys
Argued by teleconference


COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
v.    Record No. 1761-02-1          JUDGE ROBERT J. HUMPHREYS
                                        DECEMBER 23, 2002
KEVIN FULLER PURNELL


        FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
                Wilford, Taylor, Jr., Judge

        Eugene Murphy, Assistant Attorney General
        (Jerry W. Kilgore, Attorney General, on
        brief), for appellant.

        Ronald L. Smith for appellee.


    The Commonwealth of Virginia appeals a decision of the trial

court granting Kevin Fuller Purnell's motion to suppress evidence

pertaining to his indictment for possession of more than one-half

ounce, but less than five pounds, of marijuana, in violation of

Code § 18.2-248.1.  The Commonwealth contends the trial court

erred in finding that the police officers' entry into Purnell's

residence was unreasonable and amounted to a violation of his

Fourth Amendment rights.  For the reasons that follow, we reverse

the decision of the trial court.

_____

        * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.  Further, because this opinion has
no precedential value, we recite only those facts essential to
our holding.

In reviewing the ruling of a trial court on a motion to suppress, we will "consider the evidence in the light most favorable to the prevailing party below." Commonwealth v. Rice, 28 Va. App. 374, 377, 504 S.E.2d 877, 878 (1998).

At approximately 7:46 a.m., on October 26, 2001, Police Sergeant Roger Clements heard a radio dispatch advising that "a resident or a neighbor" had contacted the police department "indicating that [police] would possibly need to check on the welfare of the person who lived at [1220 West Queen Street]."[1] Clements knew "approximately who [the caller] was from some previous dealings," but did not "know anything about [her] background." Police tried to contact the caller to obtain additional information, but "she didn't want to talk to anybody."

Officer Steve Nemetz was the first to arrive on the scene. Officer Nemetz remained outside the residence from about 7:50 a.m. until approximately 8:45 a.m. At that time, Nemetz's shift ended and Officers Patterson and Cook arrived to relieve him. Sergeant Clements, who was the supervisor of patrol that morning, arrived at approximately 9:00 a.m., but left for a few moments to "check[] on some other supervisory things." He returned at about 9:30 a.m.

---

[1] Prior to this incident, Sergeant Clements had been assigned to "vice narcotics for the better part of five years." He had left that department less than one week before October 26, 2001.

-

During the time from 7:50 a.m. to 9:30 a.m., the officers walked around the residence and "beat on the door[s]," but received no response. They found that the doors to the residence were locked, and high bushes surrounding the residence made it impossible for them to "see anything" inside the house. However, they observed that the living room window was "open[] just enough to hear some[]" sound coming from either a "radio or television" inside the residence.

The officers also observed that the door to the detached garage was partially open. A car was parked in the driveway, with the passenger door ajar. The officers saw that there was "expensive electronic equipment inside." Sergeant Clements testified "[t]hat looked odd that somebody would just leave a car door open and leave that available for somebody, and it certainly wasn't in the process of being stolen." Officers ran a check of the license plate number and found that the car was registered to someone named "Bowditch from Newport News."

At the same time, officers learned that the residence was rented to Purnell. They then had "headquarters" try to contact Purnell by calling the phone number to the residence, as well as his cellular phone. The officers received no answer from either telephone.

Ultimately, officers contacted the rental property manager and obtained a key to the residence. Officer Clements testified that the officers had no information of criminal activity and that

-

they were not investigating criminal activity. However, based on the "totality of all of the circumstances," they decided to enter the residence to "check on [Purnell's] welfare." Officer Clements stated that they thought Purnell might have been "ill" or "dead." Nevertheless, they did not call for medical assistance prior to entering the house, because emergency personnel were "just several blocks down the street" and could have "respond[ed] . . . within seconds."

Officers Patterson and Cook first entered the residence between 9:00 a.m. and 9:30 a.m. As they were walking out of the residence, at approximately 9:30 a.m., Sergeant Clements returned. They told him that they had not found Purnell, but had "found some other things." They also told him that they had not looked upstairs for Purnell, nor had they looked underneath the beds, or under any piles of clutter or clothing to determine if Purnell's body was obscured from view. The officers then re-entered the residence. That search lasted approximately five to ten minutes. They did not find Purnell, and found no evidence that anyone had been injured in the home. However, Sergeant Clements observed a "gallon size container of what looked to be" "dried" and "compressed" marijuana in the kitchen. In the spare bedroom he found what appeared to be "marijuana growing."

"[A]s soon as [the officers] found that there [were] no bodies or anybody else inside of [the] residence for checking on the welfare," they left the residence and "froze the house so that

-

nobody could enter."  Sergeant Clements then called the Special

Investigations Unit, which obtained a search warrant for the

residence and seized the marijuana.

Purnell was subsequently indicted for possession, with intent

to distribute, more than one-half ounce, but less than five pounds

of marijuana, in violation of Code § 18.2-248.1.  Prior to trial,

Purnell filed a motion to suppress the evidence contending that

the officers' entry into his home violated his "constitutional

rights."

After a hearing on the motion, the trial court held:

> I'm going to sustain the motion to
> suppress . . . .  There are two problems
> with the case, and I certainly don't believe
> this was pretest [sic].  I believe that the
> officers involved were doing what they
> thought was the right thing.
>
> The problem with the case is when Officer
> Nemetz went up and couldn't see anything and
> went all around the house, I don't think
> they were justified under the [F]ourth
> [A]mendment to go any further than that.
>
> I also have some concern about the extent of
> the emergency based on what was reported.
> And, again, not having any other witness to
> give anymore information to the officers, I
> guess whoever made the call, that in my view
> supports the motion to suppress.

On appeal, the Commonwealth contends the trial court erred in

finding the officers violated the Fourth Amendment when they

entered Purnell's residence without a search warrant.  We agree.

-

In reviewing a trial court's ruling on a motion to suppress

> [t]his Court is "bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." However, whether a defendant is seized in violation of the Fourth Amendment is a question that is reviewed de novo on appeal.

Davis v. Commonwealth, 37 Va. App. 421, 429, 559 S.E.2d 374, 378 (2002) (quoting Neal v. Commonwealth, 27 Va. App. 233, 237, 498 S.E.2d 422, 424 (1998)).  Furthermore, the burden is upon the Commonwealth to show, considering the evidence in a light most favorable to Purnell, granting to him all inferences fairly deducible therefrom, that the denial constituted reversible error. Reynolds v. Commonwealth, 9 Va. App. 430, 436, 388 S.E.2d 659, 662 (1990).

> It is axiomatic that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."  United States v. United States District Court, 407 U.S. 297, 313 (1972). And a principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek to enter the home for purposes of search or arrest.  See Johnson v. United States, 333 U.S. 10, 13-14 (1948). It is not surprising, therefore, that the [United States Supreme] Court has recognized, as "a 'basic principle of Fourth Amendment law[,]' that searches and seizures inside a home without a warrant are presumptively unreasonable."  [Payton v. New York, 445 U.S. 573, 586 (1980)].

-

Welsh v. Wisconsin, 466 U.S. 740, 748-49 (1984). However, in considering whether to exclude evidence based upon this rule, we are constantly reminded that the Fourth Amendment does not forbid all searches and seizures, only those that are unreasonable. See Elkins v. United States, 364 U.S. 206, 222 (1960); Verez v. Commonwealth, 230 Va. 405, 410, 337 S.E.2d 749, 752 (1985). Thus, the United States Supreme Court has carved out a few delineated exceptions to the warrant requirement. United States District Court, 407 U.S. at 318. One such exception is known as the "emergency doctrine." See Reynolds, 9 Va. App. at 436-37, 388 S.E.2d at 663-64; see also Mincey v. Arizona, 437 U.S. 385 (1978).

The "emergency doctrine" is grounded in the consideration that "the duty of the police extends beyond the detection and prevention of crime, to embrace also an obligation to maintain order and to render needed assistance." Barrett v. Commonwealth, 18 Va. App. 773, 777, 447 S.E.2d 243, 245 (1994), rev'd on other grounds by, 250 Va. 243, 462 S.E.2d 109 (1995). The exception is expressed in terms of a "reasonably perceived 'emergency' requiring immediate entry as an incident to the service and protective functions of the police as opposed to, or as a complement to, their law enforcement functions." United States v. Moss, 963 F.2d 673, 678 (4th Cir. 1992). Accordingly, courts "'do not question the right of the police to respond to emergency situations. [Indeed,] [n]umerous state and federal [courts] have

-

recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid.'" Reynolds, 9 Va. App. at 436-37, 388 S.E.2d at 663 (quoting Mincey, 437 U.S. at 392).

In order to justify an intrusion under the "emergency doctrine," a "'police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" Id. (quoting State v. Resler, 306 N.W.2d 918, 922 (Neb. 1981)). Thus, to determine whether such an intrusion was properly warranted, the facts will be "'judged against an objective standard.'" Id. (quoting Resler, 306 N.W.2d at 922).

Here, a citizen contacted police and told them that they should check on the "welfare" of the occupant of the residence at issue. Officers called the citizen back and tried to obtain additional information, but were unable to do so because the citizen refused to speak with them further.

The officers then responded immediately to the scene. Over the course of the next approximately two hours, they canvassed the outside of the house, knocked on the door, and after determining the identity of the resident as Purnell, tried to contact Purnell by his home phone and his cellular phone. All of their attempts were to no avail.

-

During this time, officers observed 1) that the doors to the residence were locked; 2) that the television and/or a radio was on inside the home; 3) that a car, not belonging to Purnell, was in the driveway of the residence with the door ajar; 4) that the open car was filled with "expensive electronic equipment"; and, 5) that the garage door was partially open.  Based upon the "totality" of this information, the officers decided to enter the home in order to determine whether Purnell was inside and in need of emergency assistance.  Accordingly, the officers contacted the property manager and requested a key to enter the residence.  Once the property manager arrived at the scene with the key, they were able to enter.

Considering the totality of these circumstances, and most importantly, the trial court's factual finding that the actions of the officers here were not pretextual, we find that the officers' warrantless entry into the residence was constitutionally permissible pursuant to the emergency exception to the warrant requirement.  The information received by the officers reasonably led them to believe that Purnell's "welfare" was at risk and that he was thus, in need of assistance.  Their thorough investigation of the situation, including their inability after several attempts to obtain a response from Purnell and/or any occupant of the residence, reinforced this conclusion.

Furthermore, the fact that it was later determined that no emergency assistance was required is of no moment, because at the

-

time the officers entered Purnell's residence, the circumstances reasonably warranted their belief that the occupant was in need of immediate assistance.  See State v. Hedley, 593 A.2d 576, 582-83 (Del. Sup. 1990) (holding the fact that no emergency existed in actuality did not affect the emergency exception analysis); see also Reynolds, 9 Va. App. at 437, 388 S.E.2d at 664 ("Police officers are not required to possess either the gift of prophecy or the infallible wisdom that comes with hindsight.  Their conduct in making a warrantless search must be judged by the circumstances confronting the officers at the time they act.").

Likewise, contrary to Purnell's contention, nothing in the speed or character of the officers' conduct belied their stated belief that an emergency existed.  In fact, the evidence demonstrated that the officers took this matter seriously from the first instance.  During the approximate two hour period before they entered the home, the officers were consistently and busily attempting to investigate the matter further and determine a resolution to the problem.  Neither the lapse of time, nor the investigation dissipated the potential urgency of the situation. See State v. Monroe, 611 P.2d 1036, 1039-40 (Idaho 1980), vacated on other grounds, 451 U.S. 1014 (1981), on remand, 645 P.2d 363 (1982) (holding that officers' one hour delay in entering residence was not critical under the emergency doctrine analysis where evidence demonstrated emergency still existed).  Instead, these factors further justified the officers' belief, at the time

-

they entered the residence, that an individual inside was in need of emergency assistance. See United States v. Jones, 635 F.2d 1357, 1362 (8th Cir. 1980) ("When the police have a reasonable suspicion that someone is injured or that the public safety is in jeopardy, but refrain from taking immediate action in an effort to confirm or deny the suspicion, and then act once they have received no indication that the danger has been dissipated, the waiting period does not defeat the applicable exception to the warrant rule."); see also People v. Brooks, 289 N.E.2d 207 (Ill. App. 1972) (refusing to suppress evidence pursuant to the emergency doctrine, noting that "the very uncertainty created by the totality of all [the] circumstances" can provide a justification for police to take immediate action). These factors also established that the officers did not act precipitously, but acted with reasonable deliberation under the circumstances, by investigating the information they had received, and by making careful preparation for the least possible intrusive entry into the residence. See Reynolds, 9 Va. App. at 438, 388 S.E.2d at 664 (quoting State v. Fisher, 686 P.2d 750, 761 (Ariz. 1984)) ("'Police officers must not be doubted because they exercise caution and take the time to evaluate the need for a warrantless entry. Were we to hold otherwise, we would encourage precipitous and hasty entries and discourage pre-entry investigation and reflection.'").

Because we find that the officers' entry into Purnell's residence was constitutionally permissible pursuant to the emergency exception to the warrant requirement, we reverse the ruling of the trial court.  See Mincey, 437 U.S. at 393 (recognizing that where a warrantless entry is proper under the emergency exception, the police may seize evidence that is in plain view).

Reversed.

Elder, J., dissenting.

I would assume without deciding that Virginia law permits law enforcement personnel to enter a private residence without a warrant under an emergency aid doctrine and would conclude the evidence is insufficient to establish the need for an "immediate" entry to render aid to someone inside. Therefore, I respectfully dissent.

I am aware of no controlling legal authority approving the warrantless entry of a private residence by law enforcement personnel in a community caretaking or emergency aid context under circumstances totally divorced from the detection of crime. Cf. Mincey v. Arizona, 437 U.S. 385, 392, 98 S. Ct. 2408, 2413, 57 L.Ed.2d 290 (1970) (applying emergency aid doctrine to allow police entry of home after notification by resident of possible crime therein); Wood v. Commonwealth, 27 Va. App. 21, 27-28, 497 S.E.2d 484, 487 (1998) (en banc) (plurality op.) (noting neither United States Supreme Court nor any Virginia appellate court has applied the community caretaker doctrine to uphold entry of a private residence); Reynolds v. Commonwealth, 9 Va. App. 430, 435-39, 388 S.E.2d 659, 662-64 (1990) (applying emergency doctrine as type of exigent circumstance permitting entry of residence in course of investigating burglary and confirming safety of residents where police had already apprehended burglar who admitted prior entry into residence). Because I conclude the evidence here was

-

insufficient to support such an entry, I merely assume without deciding that circumstances could exist under which such an entry would be reasonable in a Fourth Amendment context.

As the majority acknowledges, "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" Welsh v. Wisconsin, 466 U.S. 740, 748-49 (1984) (quoting United States v. United States District Court, 407 U.S. 297, 313 (1972)). Accordingly, in the criminal context, it is well established that the warrantless, nonconsensual entry of a private residence requires proof of both probable cause and exigent circumstances, which include the need "to prevent imminent removal or destruction of evidence, to arrest fleeing criminal suspects, or to avoid imminent threats of death or bodily harm." United States v. Moss, 963 F.2d 673, 678 (4th Cir. 1992).

Jurisdictions which permit entry of a private residence under an emergency aid doctrine require proof of a similar exigency to justify the entrance. See id.; State v. Davis, 497 N.W.2d 910, 921 (Mich. 1993) ("not[ing] that the levels of intrusion the police make while [inventorying a car and entering a dwelling] are different" and that, although these activities "may both be categorized as 'caretaking functions,' it does not follow that both types of activities should be judged by the same standard"); see also, e.g., 3 Wayne R. LaFave, Search and Seizure § 6.6(a) (3d ed. 1996 & 2003 Supp.). "To invoke this

-

so-called 'emergency doctrine,' the person making the entry must have had an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or to prevent harm to persons . . . within." Moss, 963 F.2d at 678 (emphasis added); see State v. Nemeth, 23 P.3d 936, 944 (2001) (in case involving suicide threat, holding entry permitted to render "immediate aid" or "assistance or protection from serious harm" (emphases added)); see also Reynolds, 9 Va. App. at 436-37, 388 S.E.2d at 663-64 (to permit warrantless entry under emergency doctrine in course of investigating burglary, requiring "'reasonabl[e] belie[f] that a person within is in need of immediate aid'" (quoting State v. Resler, 306 N.W.2d 918, 922 (Neb. 1981) (quoting Mincey, 437 U.S. at 392, 98 S. Ct. at 2413)) (emphasis added)). See generally, LaFave, supra, § 6.6(a), at 391-93.

Here, although the evidence supported the trial court's finding that Sergeant Clements' decision to enter defendant's residence was not pretextual, I would hold it also compels the conclusion that neither Sergeant Clements nor the officers he supervised could have held "an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or to prevent harm to persons . . . within." See Moss, 963 F.2d at 678 (emphasis added).

The evidence in the record establishes only that the officers responded to defendant's residence based on a telephone

-

call indicating the officers "possibly would need to check on [defendant's] welfare" because defendant "couldn't be reached by home phone or cell phone." The caller did not indicate for how long she had been unable to reach defendant by phone, and she set out no other basis for her concern. When the police tried to contact her to obtain further information, she refused to speak with them. When the officers arrived at defendant's home, they noticed the door to the detached garage was open but gave no indication that anything inside the garage appeared amiss. They also noticed the door to a car parked in the driveway was partially open and that expensive electronic equipment was visible inside. At some point they obtained information that defendant was "some type of a D.J. or had something to do with music." Although the car was registered to someone other than appellant, Sergeant Clements observed merely that the open car door "looked odd" and said "[the electronic equipment] certainly wasn't [in the process of] being stolen."

Although the garage and car doors were open, the residence itself was locked, and the officers received no response to their repeated knocks and telephone calls. The officers were unable to see inside the house due to the presence of thick bushes in front of the windows, and they gained no additional information, while present at the house for a period of less than two hours, which tended to indicate that anyone inside the residence needed immediate assistance or was at risk of serious

-

harm.  The officers heard an unidentified noise, later determined to be a television, emanating from an open window in the home's living room, but they did not describe the noise as including raised voices, screams, moans or any other sounds indicative of distress.

I would hold this information was insufficient to provide the police with a reasonable belief that the warrantless entry of defendant's residence was necessary to render "immediate aid" or "protect[] [defendant or another] from serious harm."  Id. (emphases added); see State v. Carlson, 548 N.W.2d 138, 142-43 (Iowa 1996); Nemeth, 23 P.2d at 941-45 (upholding warrantless entry where police received report that defendant threatened suicide during course of argument with boyfriend and when police arrived at defendant's house, she appeared "very distraught and emotional" and said "nobody cared about her"); Duquette v. Godbout, 471 A.2d 1359, 1361-63 (R.I. 1984) (upholding warrantless entry of apartment where police encountered woman screaming and banging on door and woman said she believed her sixteen-year-old daughter was inside and that she had heard screaming in the building); see also LaFave, supra, at 396 & n.30 (noting that entry to render aid may be permissible "to seek an occupant reliably reported as missing" and citing cases involving persons missing "for some time" although they were ordinarily seen or heard from frequently).

-

For these reasons, I would affirm the trial court's decision to grant defendant's motion to suppress, and I respectfully dissent.