2006-NMSC-026
STATE OF NEW MEXICO, Plaintiff-Respondent,
v.
HEATHER R. NYCE, Defendant-Petitioner.
Docket No. 28,950.
Supreme Court of New Mexico.
Filing Date: May 22, 2006.
Corrected June 29, 2006.
Gary C. Mitchell, Ruidoso, NM, for Petitioner.
Patricia A. Madrid, Attorney General, M. Anne Kelly, Assistant Attorney General, Albuquerque, NM, for Respondent.

OPINION
BOSSON, Chief Justice.
{1}Two police officers observed Defendant Heather Nyce shopping for tincture of iodine and hydrogen peroxide, merchandise which among other things can be used in the manufacture of methamphetamine. Based on the officers' training and experience, they grew suspicious. They submitted an affidavit to a magistrate judge and obtained a search warrant for the residence where Defendant delivered her purchases. After Defendant was arrested and charged with conspiracy for trafficking methamphetamine by manufacturing, she filed a motion to suppress incriminating evidence obtained inside the residence. The district court denied the motion to suppress, and the Court of Appeals affirmed. We granted certiorari to examine inferences that may fairly be drawn from the lawful, yet suspicious, purchase of common merchandise that is capable of use in the manufacture of methamphetamine. We now reverse, holding that the affidavit did not establish probable cause for the search warrant.

BACKGROUND
{2} The following information is taken from the affidavit for the search warrant. Defendant purchased tincture of iodine and hydrogen peroxide at two stores. Both ingredients are used in the manufacture of methamphetamine. When purchasing the iodine at Wal-Mart with her infant daughter in the shopping cart, Defendant proceeded immediately to the pharmaceutical aisle and bought four 1-ounce bottles, all the iodine that was on the shelf. She placed the iodine in her shopping cart and covered it with a large box that was already in her cart. Defendant first proceeded to an automated, self-pay register with the iodine. When she noticed a line, she went to a register staffed by a cashier. Although hydrogen peroxide was available at Wal-Mart, Defendant then went to an Allsup's and purchased a 1-pint bottle of hydrogen peroxide.
{3} New Mexico State Police Agents Carr and Suggs, the officers who observed Defendant, became suspicious of her purchases for a number of reasons. In the affidavit, Agent Carr noted that in his experience observing purchases of tincture of iodine, most people buy only one bottle. He also stated that it was his experience that persons who shop for methamphetamine ingredients will often buy the items at more than one store to avoid being detected by law enforcement. Agent Carr noted that persons who are buying drug precursors[1] know where in the store the items are located, and spend little time in those aisles to avoid detection. Defendant went immediately to the aisle where the iodine was located, got it off the shelf, and walked quickly toward the registers to make the purchase.
{4} Defendant took the iodine and peroxide to the home of her boyfriend, Peter Cook. The agents suspected that Cook was involved in the manufacturing of methamphetamine because allegedly he had been seen approximately one year before stealing and purchasing methamphetamine ingredients. Also, about a year before Defendant's purchase, Agent Suggs saw Defendant at the home of an individual who Agent Carr knew had been arrested for involvement in methamphetamine manufacture and whose girlfriend had been convicted of the same crime.
{5} The agents presented their affidavit to a magistrate judge and requested a warrant to search Cook's home. The magistrate determined there was probable cause and issued the warrant. At the Cook house, the agents found ingredients and paraphernalia that are used to make methamphetamine as well as small amounts of the drug. They arrested both Cook and Defendant.
{6} After her arrest, Defendant moved to suppress items seized during the search. She argued that (1) the affidavit was insufficient to establish probable cause, (2) the affidavit contained false statements, (3) there was no nexus between Defendant and the place to be searched, and (4) the affidavit contained stale information that allegedly had occurred a year before. The district court concluded that the paragraphs which Defendant claimed were stale did "not add any information that establishes probable cause,"[2] and then held that the affidavit established probable cause to search even without those paragraphs. Following the denial of her motion to suppress, Defendant pleaded no contest to conspiracy for trafficking methamphetamine by manufacturing, but reserved her right to appeal the suppression issue. See NMSA 1978, § 30-31-20(A)(1) (1990).
{7} The Court of Appeals affirmed in a memorandum opinion. However, in its review of the sufficiency of the affidavit, the Court considered the stale evidence which the trial court found did not add to the probable cause determination. The Court also limited its decision to Defendant's first issue: whether the affidavit was factually sufficient to establish probable cause. The Court ruled that Defendant abandoned the other three issues by failing to respond to the proposed disposition to affirm. See State v. Johnson, 107 N.M. 356, 358, 758 P.2d 306, 308 (Ct. App. 1988). The State argues those issues were not preserved at trial. Since our resolution of the first issue mandates reversal, we limit our review as well to the issue of probable cause. However, we review the affidavit as the district court did, without the stale information concerning Cook's prior behavior and Cook and Defendant's former association with alleged methamphetamine manufacturers. See State v. Gonzales, 2003-NMCA-008, ¶ 13, 133 N.M. 158, 61 P.3d 867.

DISCUSSION

Standard of Review
{8} We apply a de novo standard of review to a magistrate's determination that an affidavit for a search warrant alleges facts sufficient to constitute probable cause. Gonzales, 2003-NMCA-008, ¶ 13; see also State v. Ochoa, 2004-NMSC-023, ¶ 5, 135 N.M. 781, 93 P.3d 1286. This review is limited to the contents of the affidavit. State v. Duquette, 2000-NMCA-006, ¶ 11, 128 N.M. 530, 994 P.2d 776. "`We review the affidavit by giving it a common-sense reading, considering the affidavit as a whole, to determine whether the issuing judge made an . . . independent determination of probable cause,'" based upon sufficient facts. State v. Garcia, 2002-NMCA-050, ¶ 7, 132 N.M. 180, 45 P.3d 900 (quoting State v. Whitley, 1999-NMCA-155, ¶ 3, 128 N.M. 403, 993 P.2d 117); see also Rule 5-211(E) NMRA 2006 (requiring probable cause to be based on substantial evidence); State v. Cordova, 109 N.M. 211, 213, 784 P.2d 30, 32 (1989) (same).

The Probable Cause Requirement
{9} The Fourth Amendment to the United States Constitution and article II, section 10 of the New Mexico Constitution both require probable cause to believe that a crime is occurring or seizable evidence exists at a particular location before a search warrant may issue. See also Rule 5-211(A). Accordingly, law enforcement officials must present an affidavit to a "neutral and detached magistrate" demonstrating probable cause. Johnson v. United States, 333 U.S. 10, 14 (1948); accord State v. Baca, 97 N.M. 379, 640 P.2d 485 (1982). A magistrate is required, not because officers cannot make reasonable inferences from evidence, but because the constitutional prohibition against unreasonable searches and seizures prefers an independent review of the evidence, rather than one from police who are "engaged in the often competitive enterprise of ferreting out crime." Johnson, 333 U.S. at 14. It follows then, that the magistrate's role is not simply to rubber stamp an officer's conclusion about probable cause. State v. Hughes, 532 P.2d 818, 822 (Or. Ct. App. 1975). Rather, "[t]he constitutionally mandated role of magistrates and judges in the warrant process requires them to make an `informed and deliberate' determination whether probable cause exists." Cordova, 109 N.M. at 213, 784 P.2d at 32 (quoting Aguilar v. Texas, 378 U.S. 108, 110 (1964)) (emphasis added).
{10} Probable cause exists when there are reasonable grounds to believe an offense has been or is being committed in the place to be searched. State v. Snedeker, 99 N.M. 286, 290, 657 P.2d 613, 617 (1982); Gonzales, 2003-NMCA-008, ¶ 11. Probable cause is not subject to bright line, hard-and-fast rules, but is a fact-based determination made on a case-by-case basis. See State v. Aull, 78 N.M. 607, 612, 435 P.2d 437, 442 (1967) (stating no two cases are precisely alike); People v. Miller, 75 P.3d 1108, 1113 (Colo. 2003) (en banc) (stating that probable cause analysis "does not lend itself to mathematical certainties or bright line rules"). "The degree of proof necessary to establish probable cause for the issuance of a search warrant `is more than a suspicion or possibility but less than a certainty of proof.'" Gonzales, 2003-NMCA-008, ¶ 12 (quoting State v. Donaldson, 100 N.M. 111, 116, 666 P.2d 1258, 1263 (Ct. App. 1983)). When ruling on probable cause, we deal only in the realm of reasonable probabilities, and look to the totality of the circumstances to determine if probable cause is present. State v. Garcia, 79 N.M. 367, 368, 443 P.2d 860, 861 (1968); see United States v. Basham, 268 F.3d 1199, 1203 (10th Cir. 2001).
{11} Any search pursuant to a warrant that has an affidavit lacking in probable cause is unreasonable. 2 Wayne R. LaFave, Criminal Procedure § 3.3(a), at 83 (2d. ed. 1999). Accordingly, while we give deference to a magistrate's decision, and to an officer's observations, experience, and training, their conclusions must be objectively reasonable under all the circumstances. See State v. Attaway, 117 N.M. 141, 149, 870 P.2d 103, 111 (1994) ("In New Mexico, the ultimate question in all cases regarding alleged search and seizure violations is whether the search and seizure was reasonable."); see also State v. Gutierrez, 116 N.M. 431, 444, 863 P.2d 1052, 1065 (1993) (noting that "Article II, Section 10 [of the New Mexico Constitution] expresses the fundamental notion that every person in this state is entitled to be free from unwarranted governmental intrusions").
{12} The presence of objective reasonableness is especially important when dealing with the search of a home. See State v. Ryon, 2005-NMSC-005, ¶ 22, 137 N.M. 174, 108 P.3d 1032 (noting "a search within a home raises unique concerns"); Snedeker, 99 N.M. at 288, 657 P.2d at 615 ("The fourth amendment . . . is intended to protect the sanctity of a person's home."); Payton v. New York, 445 U.S. 573, 589-90 (1980) (same). The privacy of a home is afforded the highest level of protection by our state and federal constitutions. State v. Monteleone, 2005-NMCA-129, ¶ 9, 138 N.M. 544, 123 P.3d 777, cert. granted, 2005-NMCERT-011, 138 N.M. 587, 124 P.3d 565. Both the state and federal constitutions ascribe a textual basis for protection of a home. See N.M. Const. art. II, § 10 ("The people shall be secure in their . . . homes . . . from unreasonable searches and seizures . . . ." (Emphasis added.)); U.S. Const. amend. IV ("The right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures, shall not be violated . . . ." (Emphasis added.)). Therefore, we give due weight to the fact that it is a home to be searched and its privacy invaded when we consider the objective reasonableness of a magistrate's warrant based on probable cause.

The Redacted Affidavit Did Not Establish Probable Cause
{13} Without the stale information redacted by the district court, the affidavit alleges that Defendant purchased two products, tincture of iodine and hydrogen peroxide, that are legal yet capable of being used illegally. One of those products, iodine, was purchased in an amount potentially inconsistent with personal use. Both products were purchased in a lawful yet suspicious manner, and were taken to the home in question. While these events appropriately may have been suspicious to an officer trained in the detection and interdiction of clandestine methamphetamine manufacturing, that suspicion does not necessarily equate to probable cause. See United States v. Drake, 673 F.2d 15, 18 (1st Cir. 1982) ("The purchase in a single order of all the requisite chemicals . . . for the manufacture of [methamphetamine] is a `red flag' fact which arouses suspicion, although not necessarily establishing probable cause."); cf. Ochoa, 2004-NMSC-023, ¶ 14; State v. Flores, 1996-NMCA-059, ¶ 15, 122 N.M. 84, 920 P.2d 1038.
{14} The key is whether the circumstances surrounding a lawful purchase are significant enough to give rise to probable cause. Our inquiry should be particularly exacting when both the purchase and its manner are equally consistent with legal activity. See State v. Anderson, 107 N.M. 165, 169, 754 P.2d 542, 546 (Ct. App. 1988) (stating officer's observation of facts consistent with drug courier profile was not enough to establish probable cause when those facts were just as consistent with innocent activity). Mere suspicion about ordinary, non-criminal activities, regardless of an officer's qualifications and experience, does not satisfy probable cause. See Ochoa, 2004-NMSC-023, ¶ 14; Flores, 1996-NMCA-059, ¶ 15. But cf. State v. Van Dang, 2005-NMSC-033, ¶ 16, 138 N.M. 408, 120 P.3d 830 (stating officer's training and experience can assist the evaluation of whether reasonable suspicion exists). However, ordinary, innocent facts alleged in an affidavit may be sufficient if, when viewed together with all the facts and circumstances, they make it reasonably probable that a crime is occurring in the place to be searched. United States v. Dishman, 377 F.3d 809, 811 (8th Cir. 2004); see State v. Steinzig, 1999-NMCA-107, ¶ 39, 127 N.M. 752, 987 P.2d 409; State v. Jones, 107 N.M. 503, 504, 760 P.2d 796, 797 (Ct. App. 1988). But see Anderson, 107 N.M. at 169, 754 P.2d at 546 (holding drug courier profile, which was consistent with innocent explanation, along with other innocent facts was not sufficient for probable cause); State v. Brown, 96 N.M. 10, 13, 626 P.2d 1312, 1315 (Ct. App. 1981) ("[A]n aggregate of discrete bits of information, each of which is defective, does not add up to the establishment of probable cause."). When all the suspicious activity observed does not make it reasonably probable that the manufacture of a controlled substance is occurring at a home, further investigation is needed to justify a search warrant.
{15} In considering the inferences that one can reasonably draw from Defendant's purchases, we first note that these products are not currently considered "drug precursors" or "immediate precursors" under the Drug Precursor Act, Sections 30-31B-1 to -18 (2004). See §§ 30-31B-2(L), (M), -3; 16 NMAC 19.21.35 (2005).[3] The Act lists several items that are "precursors" in Section 30-31B-3, and defines an "immediate precursor," in part, as "a substance which is a compound commonly used or produced primarily as an immediate chemical intermediary used in the manufacture of a controlled substance." Section 30-31B-2(M). Pursuant to the Act, the New Mexico Board of Pharmacy has listed several items which are "immediate precursors." See § 30-31B-4(A); 16 NMAC 19.21.35. For instance, pseudoephedrine (sudafed) is an "immediate precursor" of methamphetamine. 16 NMAC 19.21.35(W); see Commonwealth v. Hayward, 49 S.W.3d 674, 676 (Ky. 2001) ("The precursor, and main ingredient, of methamphetamine is ephedrine or pseudoephedrine." (Emphasis added). However, neither hydrogen peroxide nor tincture of iodine is listed as a "precursor" or "immediate precursor" either in the Act, or in Board of Pharmacy regulations. They are simply ingredients.
{16} The distinction between ingredients and precursors is directly relevant to the probable cause analysis in this case. While a product such as hydrogen peroxide or tincture of iodine can potentially have a limited use in the methamphetamine manufacturing process, a product that is an "immediate precursor" is, according to our Legislature, "a substance . . . commonly used or produced primarily as an immediate chemical intermediary used in the manufacture of a controlled substance." Section 30-31B-2(M) (emphasis added). In the realm of reasonable probabilities, therefore, it is more likely that the purchase of methamphetamine "precursors" or "immediate precursors" would be for an illicit purpose and give rise to an incriminating inference, as compared to the purchase of mere ingredients like iodine and hydrogen peroxide. The Legislature, along with the Board of Pharmacy, appears to have said as much, and we give those official classifications great weight when considering the appropriate inferences to be drawn from the purchase or possession of those products.[4]
{17} In a given case, the purchase of even a legal product may be sufficiently large or otherwise suspicious to rise to the level of probable cause.[5]See Harper, 105 P.3d at 889 (stating defendant purchased one gallon of tincture of iodine); cf. State v. Brenn, 2005-NMCA-121, ¶ 15, 138 N.M. 451, 121 P.3d 1050 (holding the jury could infer attempt to manufacture methamphetamine from possession of over 5000 pseudoephedrine pills and 7 gallons of iodine because there is no legal purpose to possess such large amounts). The purchase of one single 1-pint bottle of hydrogen peroxide falls far short of the mark.
{18} Admittedly, Defendant's purchase of the iodine casts a darker shadow. Four 1-ounce bottles might appear excessive, and more impressive still, it was all the iodine on the shelf. But see 2 Wayne R. LaFave, Search And Seizure § 3.7(d), at 412 (4th ed. 2004) (explaining that a statement in an affidavit that an item can be used to manufacture illegal drugs is only a truism and adds nothing to probable cause). However, the officers' remaining observations  Defendant covering the iodine in her shopping cart, her attempt to use the self-pay register, her hurried pace, and her purchase of hydrogen peroxide at another store  all serve to "highlight the ordinary, rather than the sinister," in terms of what one can observe daily in shopping centers throughout the state. Anderson, 107 N.M. at 169, 754 P.2d at 546. These remaining observations may be suspicious to the trained eye, but even when considered as a whole they do not give rise to probable cause. Notably, the officers provided no additional relevant information in the affidavit to demonstrate why these two purchases made it reasonably probable that Defendant was manufacturing methamphetamine.
{19} In addition, the officers were seeking a warrant to search not just Defendant, but the house to which she delivered her purchases. When officers believe controlled substances are being manufactured in a residence, there must be a sufficient nexus in the affidavit between the activities observed, and the officers' belief that manufacture is occurring at that home. 2 LAFAVE, supra, § 3.7(d). We have already explained why Defendant's purchases did not create probable cause. The mere fact Defendant brought those same items to her home does not make it any more or less probable that she would use those items for an illicit purpose. In other words, it adds nothing to elevate her suspicious purchases from mere suspicion to probable cause, except that the officers needed more information to establish a reasonable belief that methamphetamine was being manufactured at the house. Thus, there was not a sufficient nexus between her purchases and this belief. Absent other probative information, the state and federal constitutions do not permit law enforcement, and especially the reviewing magistrate, to make the leap from suspicious, albeit legal, purchases of items that may be used to make methamphetamine to the actual manufacture of that substance at that particular location.
{20} Failure to draw this nexus was fatal to the affidavit in People v. Kazmierski, 25 P.3d 1207, 1213 (Colo. 2001) (en banc). There, the Colorado Supreme Court considered evidence that two suspects purchased known precursors to methamphetamine over a period of five months, one of the suspects was seen in a car smoking something in a glass pipe similar to those used for methamphetamine, and the two suspects lived together. The Court held the evidence was insufficient to establish probable cause to search their residence. Id.
{21} The Colorado Supreme Court's foremost concern was the failure to "recite any other facts that would support probable cause to believe that the defendants were manufacturing methamphetamine inside the home." Id. at 1212 (emphasis added). The Court noted additional factual allegations that might have sufficed, such as a distinctive odor associated with methamphetamine manufacture emanating from the home. Id.; see also United States v. Failla, 343 F. Supp. 831, 835 (W.D.N.Y. 1972) (holding no probable cause existed despite suspiciousness of purchase of a chemical commonly used in the manufacture of illegal drugs, because defendant was never observed either making or selling illegal drugs). The mere purchase of precursors without more, the Court found, was insufficient because it failed to establish a nexus between that activity and the alleged manufacturing in the home to be searched. Kazmierski, 25 P.3d at 1212-13. "This was not a circumstance in which the crime occurred off site, and the affidavit had merely to establish a reasonable basis for believing that evidence of the crime would be located at the home. Rather, the crime consisted of the manufacture of methamphetamine  a crime requiring a location." Id. at 1212. We note that the affidavit in Kazmierski contained more incriminating information than the affidavit presented to the magistrate in the case before us.
{22} In the main, observed suspicious activity should be the beginning, not the end, of the investigation. In Defendant's case, the officers did not observe anything additional at the residence that would support a conclusion that methamphetamine was being manufactured inside. The officers reported no smells emanating from the house, no presence of equipment, supplies, or other methamphetamine ingredients or precursors other than the two small purchases Defendant brought to the house. The affidavit does not suggest that Defendant or Cook had previous arrests for the manufacture, sale, or possession of controlled substances, and contained nothing recent pointing to incriminating activities on their part. No individuals known to have been involved in the manufacture, sale, or possession of methamphetamine were seen at the household.
{23} The officers did not speak with neighbors to ask if they had observed any suspicious activities. There was no informant's tip[6] or an undercover buy at the house. The officers did not attempt to gain consent to search the residence or perform a "knock and talk" to try and gain information. See Florida v. Bostick, 501 U.S. 429, 434-35 (1991) (indicating that officers do not need any basis of suspicion to ask general questions of an individual, including asking for consent to search); United States v. Cormier, 220 F.3d 1103, 1109 (9th Cir. 2000) (opining that the "`knock and talk'" investigative technique is legal in the absence of suspicion as a "firmly-rooted notion in Fourth Amendment jurisprudence").
{24} These are examples only, not an exhaustive list of what officers commonly do to complete a proper investigation. Absent some additional investigative effort of this kind, we are compelled to conclude that the affidavit did not sufficiently connect Defendant's activities to the manufacture of methamphetamine at this particular residence. The officers acted prematurely in obtaining the warrant.
{25} Most judicial opinions brought to our attention concerning the manufacture of methamphetamine appear to require additional investigative activity, similar to the foregoing suggestions before a warrant will issue. See State v. Ballweg, 670 N.W.2d 490, 498 (N.D. 2003) (holding affidavit sufficient where defendant purchased ingredients used to manufacture methamphetamine, including pseudoephedrine, and purchased supplies used to make and cut methamphetamine, and detached garage at residence had covered windows and a tarp which prevented ability to look inside); State v. Bowles, 18 P.3d 250 (Kan. Ct. App. 2001) (noting purchase of precursors and other items used to manufacture methamphetamine, along with defendant's prior conviction for possession and sale of same, smell of ether emanating from house, and tip from informant that house was being used for manufacture established probable cause).[7]
{26} We note one case from North Dakota particularly close to the facts before us. In State v. Lewis, 527 N.W.2d 658, 662-63 (N.D. 1995), the North Dakota Supreme Court found that an affidavit did not establish probable cause to believe the suspects were growing marijuana in their home. The affidavit indicated that over a seven-month period Lewis had purchased several pieces of equipment commonly used for growing marijuana. Officers then performed surveillance on the Lewis house, an investigative step omitted in the case before us, using a device that showed excessive heat loss from one side of the house, and the officers noticed the windows on that side were covered with insulation. The officers knew that covering windows is a common tactic used by marijuana growers to prevent visual observation and heat loss. Also, heat loss beyond the normal amount for a household suggested an indoor growing operation. Nonetheless, the North Dakota Supreme Court found the information was insufficient to establish probable cause because insulating windows during the winter was common in North Dakota, and the heat loss and growing equipment were equally capable of a benign explanationthe indoor cultivation of other plants. Id.
{27} Applying the holding in Lewis to the present case strongly suggests that Defendant's purchases and other suspicious activity, without additional investigation, cannot rise to the level of probable cause necessary for a warrant to search a home. Cf. Ballweg, 670 N.W.2d at 498 (holding affidavit sufficient where defendant purchased ingredients used to manufacture methamphetamine, including pseudoephedrine, and purchased supplies used to make and cut methamphetamine, and detached garage at residence had covered windows and a tarp which prevented ability to look inside).
{28} Accordingly, we conclude that Defendant's suspicious activities did not give rise to probable cause to search the Cook residence. Because no other information was presented in the affidavit to confirm the officers' suspicions and establish the crucial link to the residence to be searched, the affidavit was insufficient. The warrant was therefore unconstitutionally defective, and the evidence seized as a result of the search should have been suppressed.[8]

CONCLUSION
{29} We reverse the order of the Court of Appeals affirming the district court's denial of Defendant's motion to suppress.
{30} IT IS SO ORDERED.
________________________________
RICHARD C. BOSSON, Chief Justice
WE CONCUR:
________________________________
PAMELA B. MINZNER, Justice
________________________________
PETRA JIMENEZ MAES, Justice
________________________________
EDWARD L. CHÁVEZ, Justice
SERNA, Justice (dissenting).
{31} I respectfully dissent. I would affirm the district court and the unanimous Court of Appeals panel. As a preliminary matter, I prefer the State v. Gomez interstitial analysis in adjudicating overlapping state and federal constitutional claims. 1997-NMSC-006, ¶¶ 19-22, 122 N.M. 777, 932 P.2d 1. "Under the interstitial approach, the court asks first whether the right being asserted is protected under the federal constitution. If it is, then the state constitutional claim is not reached. If it is not, then the state constitution is examined." ¶ 19. Applying independent and adequate state law to a defendant's motion to suppress could likely create a different outcome than applying federal law (such as the application of the good faith exception to the exclusionary rule), which is why a separate analysis and conclusion regarding these two distinct approaches is important. Even in the context of the majority's combined state-federal analysis and outcome, I ultimately agree with the trial court and the Court of Appeals that the affidavit presented by law enforcement satisfied the probable cause standard and that there was a sufficient nexus between the affidavit's allegations and the house searched.
{32} The first issue is whether the affidavit presented to the magistrate satisfied probable cause for a search. The affidavit detailed how Defendant took all four 1-ounce bottles of iodine available at the store off the shelf and hid it under something else in her cart before purchasing it. Defendant then went to another store to purchase hydrogen peroxide, even though hydrogen peroxide was available at the first store very near the iodine. The majority states that this highlights the ordinary; I cannot agree that this is ordinary behavior, especially given the fact that the law enforcement affiant knew through training and experience that "most people purchasing tincture of iodine generally buy only one bottle" and "persons shopping for methamphetamine precursors often buy the items at more than one store in order to avoid detection by law enforcement."
{33} The Majority Opinion, ¶ 16, states, "[t]he distinction between ingredients and precursors is directly relevant to the probable cause analysis in this case." It is too formalistic to argue that a judge's probable cause determination should be affected by the fact that tincture of iodine and hydrogen peroxide are ingredients to create an immediate precursor, but are not formally listed as immediate precursors. It goes against common sense and the facts presented to the magistrate. State v. Donaldson, 100 N.M. 111, 116, 666 P.2d 1258, 1263 (Ct. App. 1983). Law enforcement presented the magistrate with the following information:
Affiant knows through training and experience that tincture of iodine is used to make iodine crystals, which are a main ingredient used in the manufacture of methamphetamine. . . . Affiant knows through training and experience that hydrogen peroxide is a main ingredient used to crystallize iodine from tincture of iodine. Affiant also knows through training and experience that iodine cannot be used in the tincture form for the manufacturing of methamphetamine, rather it must first be crystallized using hydrogen peroxide.
The affidavit is clear that law enforcement knew that tincture of iodine and hydrogen peroxide are ingredients that easily become iodine crystals, a main ingredient for methamphetamine. Iodine crystals are formally called an immediate precursor in New Mexico's administrative code. 14 NMAC 16.19.21.35. How are we advancing state and federal constitutional protections by concluding that tincture of iodine and hydrogen peroxide, which are combined to create the immediate precursor of iodine crystals, are in a totally different category from the already-formed iodine crystals, and do not give rise to probable cause even when bought on the same day by a suspect? Perhaps the Legislature ought to consider amending the Drug Precursor Act to clarify its intent regarding whether multiple ingredients that combine to become immediate precursors bought by a suspect on the same day should be treated differently than immediate precursors per se.
{34} In addition to the inferences that can be drawn from the affidavit, our courts have previously decided this issue in Donaldson, 100 N.M. at 111, 666 P.2d at 1258. The police in Donaldson acted on an informant's tip and observed suspicious but legal activities by the defendants, such as paying cash for airplane tickets to Las Vegas, Nevada; boarding the plane under fictitious names; returning home to Albuquerque a few days later; and transferring packages between two cars while outside the residence to be searched. Id. at 114, 666 P.2d at 1261. Law enforcement obtained a search warrant and seized drug contraband from the residence. Id. The Donaldson defendants moved to suppress the evidence on the basis that the affidavit did not support probable cause. The trial court and the Court of Appeals disagreed and found that the affidavit sworn to by a narcotics agent was sufficiently detailed to support probable cause. Id. at 115-16, 666 P.2d at 1262-63. In the pending case, law enforcement observed Defendant's suspicious purchase of known methamphetamine ingredients and delivery of the contraband to the house. Law enforcement had direct evidence so an informant's tip regarding illegal substances was not necessary to complete the inference. Because law enforcement and the judge had just as much if not more incriminating information, I would follow Donaldson and also find that the affidavit merited issuance of the search warrant.
{35} The second issue is whether the information in the affidavit created a sufficient nexus to the home to be searched. The Majority Opinion, ¶ 19, states a proposition and uses the term "sufficient nexus" without any citation to case law authority to support the proposition or explain the term so that it can be consistently applied in future cases. The facts are that Defendant delivered the methamphetamine ingredients to the house that was searched on the same day as her purchase.
The female subject returned to her vehicle and Affiant along with Agent Suggs followed her to a residence located at 18 Sage, Boles Acres, Otero County, New Mexico, as described above. Affiant and Agent Suggs observed the female, believed to be Heather Nyce, along with Peter Cook unload the shopping bags from the vehicle and carry them inside the residence.
Common sense tells me this is sufficient nexus. Common sense is also a controlling consideration in determining if probable cause existed. Donaldson, 100 N.M. at 116, 666 P.2d at 1263. Furthermore, in People v. Kazmierski, 25 P.3d 1207 (Colo. 2001) (en banc), the out-of-state case upon which the majority relies to argue that lack of nexus between the alleged criminal activity and house to be searched is fatal to the probable cause determination, is not applicable. The Kazmierski court, in finding a lack of nexus to the house searched, stated "not only did the investigator not see the items transported into the home, but more importantly, the investigator did not recite any other facts . . . ." 25 P.3d at 1212-13. In the pending case, the affidavit details that law enforcement did witness Defendant deliver the methamphetamine ingredients to the house searched, which renders Kazmierski unpersuasive for the nexus reasoning.
{36} Defendant has convinced a majority of this Court to apply the exclusionary rule and suppress the evidence against her on the basis that the evidence was illegally obtained. Because I conclude that probable cause existed and Defendant's constitutional rights were not trampled upon, I consider the rationale for the exclusionary rule. A purpose of the exclusionary rule is to deter police misconduct by excluding evidence that law enforcement acquired through unconstitutional means. In discussing the scope of the exclusionary rule, the United States Supreme Court stated "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." United States v. Leon, 468 U.S. 897, 916 (1984). See also Stone v. Powell, 428 U.S. 465, 486 (1976); State v. Gutierrez, 116 N.M. 431, 447, 863 P.2d 1052, 1068 (1993) ("deterrence of future constitutional violations is a critical state interest that is a by-product of the exclusionary rule"). Defendant has not alleged egregious law enforcement behavior nor alleged that the judge reviewing the affidavit for the warrant did not perform as a detached and neutral judicial officer. In considering the affidavit in light of the motion to suppress, the district court judge even struck certain portions, which would indicate a thoughtful review rather than a rubber stamp. This case does not compel invocation of the exclusionary rule, as the lower courts have previously determined. What more does the judiciary want from law enforcement besides peaceable, constitutionally compliant observation of suspicious behavior, coupled with approval from a detached and neutral judge? The Majority Opinion, ¶ 23, suggests different approaches law enforcement could have taken. Aside from the fact that as a court it is not within our power to advise law enforcement officials as to how they should conduct an investigation, the suggestions are unrealistic given the circumstances. If law enforcement officers spoke with neighbors or performed a "knock and talk" at the suspected residence to gain information, law enforcement would be just as likely to tip off criminals to the fact that they were being investigated and therefore hinder the interdiction. It is not our role to concoct requirements beyond what the constitutions demand.
{37} Instead, we have an opinion that relies upon non-binding precedent that the parties did not argue to the Court in order to come to a conclusion that will hamper law enforcement's efforts in eradicating methamphetamine from New Mexico's communities. Ironically, we do so in a case in which the Defendant pled no contest to manufacturing methamphetamine, which suggests that law enforcement's suspicions were right on target. It is a pyrrhic victory for the constitutional protections against unreasonable search and seizure and for the exclusionary rule.
NOTES
[1] The affidavit appears to use methamphetamine "ingredients" and methamphetamine "precursors" interchangeably. However, under the Drug Precursor Act, NMSA 1978, §§ 30-31B-1 to -18 (2004), none of the items purchased by Defendant were" precursors." See n.3, infra.
[2] The stale information, not considered by the district court, was contained in three paragraphs of the affidavit. These included Cook having been observed stealing and purchasing methamphetamine ingredients, and Defendant having been associated with known methamphetamine manufacturers, both occurring a year or so before Defendant was observed making these purchases.
[3] The Court of Appeals and the State asserted that tincture of iodine and hydrogen peroxide are drug precursors under the Act. We are not persuaded. There is no mention of hydrogen peroxide anywhere in the Act. Iodine crystals and iodine matrix are listed as precursors, but the State, which has the burden of proof, presented no evidence that tincture of iodine is included in either of these two categories. Further, the affidavit only describes these items as ingredients, not precursors under the Act. It explains that tincture of iodine is used to make iodine crystals, which are a main ingredient to methamphetamine, and hydrogen peroxide is a main ingredient used to crystalize tincture of iodine. Thus, at best, it appears these two items are used to make some of the ingredients or precursors of methamphetamine, but are not themselves precursors.
[4] For purposes of completeness, we observe that in New Mexico it is legal to purchase even a "precursor" or "immediate precursor." See Section 30-31B-12; cf. State v. Harper, 105 P.3d 883, 889 (Or. Ct. App. 2005) (noting because ORS 475.967(1) makes it illegal to possess a precursor with intent to manufacture a drug, probable cause to believe manufacture is occurring can exist if purchase is coupled with intent).
[5] The dissent appears to interpret our distinction in this case between mere ingredients and precursors or immediate precursors as dispositive of the probable cause analysis. See infra, ¶ 33. This is simply not the case. Probable cause is a fact-based inquiry by nature, and the outcome of each case like this one will vary, not based on whether the items purchased are precursors, but rather all of the surrounding circumstances. We merely conclude in this case that Defendant's purchases, while suspicious, did not give rise to probable cause. The suspicious inference might have been more persuasive had Defendant produced actual precursors.
[6] The dissent indicates that it would follow the Court of Appeals opinion in State v. Donaldson, 100 N.M. 111, 666 P.2d 1258 (Ct. App. 1983). See infra, ¶ 34. The dissent argues that "law enforcement had just as much if not more incriminating information," than in this case. Id. In fact, the affidavit in Donaldson, as the dissent notes, was supported by an informant's tip. No such tip existed in this case. Moreover, the suspects in Donaldson used fictitious names to board an airplane, purportedly to obtain drugs. The use of fictitious names is highly suspicious activity, and no similar allegations were made in this case. We do not find Donaldson persuasive.
[7] See also United States v. Swanger, No. Crim.A.05-53-JBC., 2005 WL 2002441, at *6 (E.D. Ky. Aug. 18, 2005) (stating warrant to search hotel room upheld when defendants were seen purchasing two precursors to manufacture of methamphetamine, drug dog alerted to their vehicle, hotel was known for drug activity, and room was registered to one of defendants); Dishman, 377 F.3d at 810-11 (holding an individual's purchase of substance sometimes used in the manufacture of methamphetamine and transporting substance in a truck registered to an individual who was involved in the sale and manufacture of methamphetamine to the defendant's residence, in conjunction with defendant's previous criminal charge involving another methamphetamine precursor, observation of several items that are used in the manufacture of methamphetamine at the residence, and other information established probable cause); State v. Eshnaur, 106 S.W.3d 571, 576 (Mo. Ct. App. 2003) (stating affidavit was sufficient when it stated that residence had previously been closed due to presence of methamphetamine lab, police observed ingredients and supplies used to make methamphetamine, and defendant was on probation for manufacturing); Drake, 673 F.2d at 18 (holding purchase in single order of all chemicals necessary to make methamphetamine, plus purchase of equipment and cutting materials used for the same, in conjunction with viewing of lab equipment inside place to be searched, and defendant's suspicious activity of driving in an evasive manner established probable cause); United States v. Coppage, 635 F.2d 683, 686 (8th Cir. 1980) (noting probable cause existed where the defendant purchased under a false name a number of different precursors, an odor of one of the precursor chemicals was detected, and the defendant discarded a seal identical to that found on the container of another precursor chemical).
[8] The dissent argues, "This case does not compel invocation of the exclusionary rule." See infra, ¶ 36. For this proposition, the dissent cites to United States v. Leon, 468 U.S. 897, 916 (1984) ("[T]he exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates."). Leon, of course, is the seminal Supreme Court decision that created the good-faith exception to the exclusionary rule. There, the Court concluded the rule, which is in place solely to deter police misconduct, would not apply when "an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." 468 U.S. at 920. This Court squarely rejected the application of the good-faith exception to warrants which lack sufficient probable cause under the New Mexico Constitution's counterpart to the Fourth Amendment, article II, section 10. See State v. Gutierrez, 116 N.M. 431, 445, 863 P.2d 1052, 1066 (1993). We did so, because we believed the purpose of the exclusionary rule in New Mexico is "not . . . deterrence or judicial integrity . . . instead, [the] focus is to effectuate in the pending case the constitutional right of the accused to be free from unreasonable search and seizure." Id. at 446, 863 P.2d at 1067. In New Mexico, when law enforcement fails to establish probable cause in an affidavit, we do not make any inquiry as to whether the exclusionary rule should be applied because "we will not sanction that conduct by turning the other cheek." Id.