**Certiorari Denied, No. 31,515, February 27, 2009; Granted No. 31,526, February 23, 2009**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2009-NMCA-021**

**Filing Date: December 29, 2008**

**Docket No.  27, 019**

**STATE OF NEW MEXICO,**

    **Plaintiff-Appellee,**

**v.**

**BRIAN PHILLIPS,**

    **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**John A. Dean, District Judge**

Gary K. King, Attorney General
Chris Conlee, Assistant Attorney General
Santa Fe, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Cordelia A. Friedman, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**ALARID, Judge.**

**{1}**     Defendant-Appellant, Brian Phillips, appeals from his conviction for battery on a peace officer.  We affirm.

**BACKGROUND**

1

**{2}**     The victim, Officer James Roberts of the City of Bloomfield Police Department, was one of three police officers who responded to a complaint about an intoxicated person who was "loud and knocking over trash cans" in the early morning hours of September 13, 2005. Officer Roberts was the second officer to arrive. Officer Roberts was in uniform and was driving a marked patrol car. Defendant was stumbling around and unable to keep his balance. Defendant gave off a strong odor of alcohol. Defendant admitted that he had been drinking. Defendant appeared "obviously intoxicated" to Officer Roberts. From previous encounters, Officer Roberts knew that Defendant lived in another part of Bloomfield, New Mexico. In response to questioning about why he was in the particular area of town, Defendant explained that he was in the area looking for the residence of a person who Defendant believed had stolen some of Defendant's property. Although Defendant was "loud and obnoxious" and was obviously angry at the person he was looking for, Defendant was not angry or aggressive toward the officers.

**{3}**     Officer Roberts did not believe that he had probable cause to arrest Defendant for any crime. However, Officer Roberts was concerned that Defendant's intoxication made Defendant a threat to himself or to others he might encounter in his intoxicated condition. In Officer Roberts' judgment, releasing Defendant and letting him go on his way was not an option. Officer Roberts believed that New Mexico law authorized him to transport Defendant to a treatment facility or to take Defendant home. At the time, the established policy of the Bloomfield Police Department was to take intoxicated persons with a known residence in Bloomfield to their homes, rather than to a treatment facility, so that the City of Bloomfield would not be charged for the cost of care at a treatment facility.

**{4}**     Officer Roberts directed Defendant to get into the back of Officer Roberts' patrol car, explaining to Defendant that he was going to give Defendant a ride home. Defendant seemed "fine" with being taken home and responded, "O.K." Officer Roberts patted down Defendant but did not handcuff him. Defendant got into the back of the patrol car, and Officer Roberts shut the door. According to Officer Roberts, "I was doing him a favor by giving him a taxi ride home free of charge, actually—so I didn't see it as a seizure issue." The back seat of the patrol car was separated from the front of the car by a plastic partition. The patrol car had no handles on the inside of the back doors, which locked automatically, so that once Defendant was in the back seat of the patrol car with the doors shut he could not get back out. As Officer Roberts was speaking to another officer, Defendant began yelling and banging on the rear driver's side window of Officer Roberts' patrol car. Defendant knocked the window glass out of its track, damaging the window frame. Officer Roberts returned to his patrol car and opened the driver's side rear door, positioning himself in the angle between the door and the back seat of the car. As Defendant moved to get out of the car, he punched Officer Roberts in the face, knocking his glasses askew. Officer Roberts and the other officers subdued Defendant after a struggle. The officers handcuffed Defendant, advising him that he was under arrest.

**{5}**     Defendant was charged with battery on a peace officer, resisting arrest, disorderly conduct, and criminal damage to property. Defendant moved to dismiss the charges,

2

asserting that Officer Roberts had had no lawful authority to seize Defendant. In his motion to dismiss, Defendant argued that "Defendant was not charged with any crime, was not under arrest, and there was no danger of an immediate 'breach of the peace.'"

{6}     The State filed a response, citing *State v. Doe* (*Doe II*), 92 N.M. 100, 583 P.2d 464 (1978). The State argued that, under *Doe II*, even if the seizure of Defendant was illegal, Officer Roberts was acting in the lawful discharge of his duties as long as he was not engaged in a personal frolic when he seized Defendant. The State also argued that the seizure was in fact lawful because Defendant consented to the seizure or because Officer Roberts was authorized by NMSA 1978, §§ 43-2-1.1 to -23 (1949, as amended through 2005) (the Detoxification Act) to take Defendant into protective custody.

{7}     Defendant filed a reply in which he pointed out that the Legislature had amended the Detoxification Act, repealing effective July 1, 2005, the provision that formerly authorized peace officers to take an intoxicated person into protective custody and to transport him to his residence.

{8}     The district court held an evidentiary hearing on March 13, 2006. Officer Roberts was the sole witness. Defendant was present but did not testify. The district court denied Defendant's motion to dismiss in a brief order. Thereafter, the district court accepted Defendant's conditional plea of guilty to battery on a peace officer and criminal damage to property. In the plea agreement, Defendant expressly reserved the right to appeal the district court's denial of Defendant's motion to dismiss.

## DISCUSSION

{9}     On appeal, Defendant argues that he cannot be convicted of battery on a peace officer because Officer Roberts was acting without lawful authority when he placed Defendant in the back seat of his patrol car. While we agree with Defendant that the Legislature limited the offense of battery on a peace officer to situations where the officer-victim was acting within his actual authority in detaining the subject, we disagree with Defendant's assertion that Officer Roberts lacked actual legal authority to take Defendant into protective custody.

### Statutory Framework for Battery on a Police Officer

{10}     The Legislature has defined the felony offense of battery on a peace officer as "the unlawful, intentional touching or application of force to the person of a peace officer *while he is in the lawful discharge of his duties*, when done in a rude, insolent or angry manner." 1971 N.M. Laws, ch. 265 § 4 [codified at NMSA 1978, § 30-22-24 (1971)] (emphasis added). Battery on a peace officer differs from simple battery, NMSA 1978 § 30-3-4 (1963), by including an additional requirement that the victim have been "a peace officer while he is in the lawful discharge of his duties." Battery on a peace officer is a fourth degree felony, Section 30-22-24(B); simple battery is a petty misdemeanor, Section 30-3-4.

3

**{11}** To place the phrase "while he is in the lawful discharge of his duties" in context, we briefly review the criminal law's treatment of resistance to peace officers. The common law strictly distinguished resistance to lawful arrests from resistance to unlawful arrests: "When an illegal arrest is made by an officer, the person arrested may resist the arrest or the continuation of custody thereunder, but not to the extent of excessive violence." *State v. Calhoun*, 23 N.M. 681, 686, 170 P. 750, 751 (1917). However, where the arrest was lawful, "no resistance whatever on the part of the arrested person was permissible." *Id.* at 687, 170 P. at 751. Whether an arrest was lawful depended upon the officer-victim's actual authority to arrest. *See, e.g., State v. Middleton*, 26 N.M. 353, 357-60, 192 P.483, 484-85 (1920) (discussing the authority of a special officer proceeding under a defective arrest warrant; reversing a first degree murder conviction; holding that the trial court should have instructed the jury that the attempted arrest was illegal as a matter of law); *Bad Elk v. United States*, 177 U.S. 529, 534-38 (1900) (reviewing common-law principles and federal and state statutes authorizing warrantless arrests; reversing a murder conviction based on trial court's failure to instruct jury on defendant's right to resist an illegal warrantless arrest). Under the common law, an individual employing reasonable force to resist an unauthorized arrest by a peace officer was not guilty of assault and battery; instead, the officer was deemed to have been the wrongdoer. *A Treatise on the Law of Crimes* § 10.19 at 735 (Marian Quinn Barnes revising ed., 7th ed. 1967).

**{12}** We read Section 30-22-24 as evincing the Legislature's intention to codify the common law summarized in *Calhoun* and as authorizing felony punishment for resistance to a peace officer only where the officer-victim had legal authority to seize the suspect. A number of well-established rules of construction lead us to this conclusion. Although the traditional common-law rule recognizing a privilege to resist an unlawful arrest was subject to criticism, *see generally* Ralph D. Smith, Comment, *Criminal Law—Arrest—The Right to Resist Unlawful Arrest*, 7 Nat. Resources J. 119 (1967), it appears to have been the majority rule in 1971 when our Legislature enacted Section 30-22-24. Moreover, as of 1971, no reported New Mexico appellate decision appears to have questioned the continuing vitality of *Calhoun*. "[S]tatutes will be read strictly so that no innovation upon the common law that is not clearly expressed by the legislature will be presumed. A statute will be interpreted as supplanting the common law only if there is an explicit indication that the legislature so intended." *Sims v. Sims*, 1996-NMSC-078, ¶ 22, 122 N.M. 618, 930 P.2d 153 (citations omitted). Nothing in Section 30-22-24 clearly evinces the Legislature's intention to modify, much less abrogate, the common law as articulated in *Calhoun*. "When a statute contains language which is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." *State v. Jonathan M.*, 109 N.M. 789, 790, 791 P.2d 64, 65 (1990). The qualifier "lawful" used in the phrase "lawful discharge of his duties" had a well-established plain meaning: "Legal; warranted or authorized by the law; having the qualifications prescribed by law; not contrary to nor forbidden by the law." *Black's Law Dictionary* 885 (4th ed. 1957). "Penal statutes must be strictly construed, and the definition of crimes therein contained is not to be broadened by intendment." *State v. Allen*, 77 N.M. 433, 434, 423 P.2d 867, 868 (1967). Construing the phrase "lawful discharge of his duties" as equivalent to "discharge of his duties" would render nugatory the modifier "lawful," and

4

would significantly broaden the range of circumstances criminalized by Section 30-22-24. If our Legislature had intended to authorize felony punishment for resistance to unlawful arrests it easily could have done so by omitting the crucial qualifier "lawful" immediately before the phrase "discharge of his duties," or by enacting language declaring the lawfulness of the officer's conduct immaterial, *e.g.*, Kan. Stat. Ann. Section 21-3217 (1969) (providing that "[a] person is not authorized to use force to resist an arrest which he knows is being made either by a law enforcement officer or by a private person summoned and directed by a law enforcement officer to make the arrest, even if the person arrested believes that the arrest is unlawful").

**Statutory Construction**

**{13}** We construed the phrase "lawful discharge of his duties" in *State v. Frazier*, 88 N.M. 103, 105, 537 P.2d 711, 713 (Ct. App. 1975). *Frazier* concerned two police officers who intervened in a non-violent civil dispute between a motel manager and a motel guest. When the guest ran from the motel, one of the officers chased and stopped the guest, demanding that the guest return to the motel with him. *Id.* at 104, 537 P.2d at 712. The guest refused to accompany the officer, and when the officer stopped the guest a second time, the guest struck the officer. A second officer arrived and the two officers restrained the defendant and placed her under arrest for resisting a peace officer. *Id.* at 104-05, 537 P.2d at 712-13. We concluded that the first officer did not have "any general or specific grounds of suspicion that a criminal offense had been committed," and therefore that the officer had "exceeded his authority" when he detained the guest. *Id.* at 105, 537 P.2d at 713. We held that when the guest forcibly resisted the second unlawful detention by hitting the officer, she could not have violated NMSA 1953, Section 40A-22-1(B) (1963), because the statutory definition of resisting arrest requires the officer-victim to have been in the *lawful* discharge his duties. *Id.* Our interpretation of "lawful discharge of his duties" in *Frazier* followed the common law by limiting the phrase "lawful discharge of his duties" to situations where a peace officer is acting within his actual legal authority in seizing a person.

**{14}** Our Supreme Court distinguished *Frazier* in *State v. Doe* (*Doe I*), 92 N.M. 109, 110, 583 P.2d 473, 474 (Ct. App. 1978). In *Doe I*, a juvenile was arrested for disorderly conduct for loudly objecting to a traffic stop. *See id.* The arresting officer took the defendant to the police station and turned him over to the booking officers. The defendant fought the booking officers when they forcibly subjected him to a strip search. *Id.* at 111, 583 P.2d at 475. On appeal from his convictions for disorderly conduct and battery on a peace officer, this Court reversed both convictions. We held that the juvenile defendant's verbally aggressive but physically non-combative behavior did not give the arresting officer probable cause to believe that the juvenile had committed disorderly conduct and, therefore, the arrest was illegal. *Id.* As to the conviction for battery on a peace officer we reasoned as follows:

> The strip search was an incident of the child's illegal arrest for disorderly conduct. That arrest being illegal, in this case the search was illegal.

5

Section [30-22-24] defines battery upon a police officer to include an "unlawful" touching of a police officer "in the lawful discharge of his duties." We need not consider whether resisting an illegal search was unlawful action by the child. Clearly, an officer conducting an illegal search is not in the lawful discharge of his duties. Under the evidence, [Section 30-22-24] was not violated.

*Id.* (citations omitted). On appeal to the Supreme Court by the State, the Supreme Court affirmed our reversal of the disorderly conduct conviction but reversed our reversal of the conviction for battery on a peace officer. *Doe II*, 92 N.M. at 101-02, 583 P.2d at 465-66.

**{15}** The Supreme Court's opinion in *Doe II* addresses three points. First, the Supreme Court prospectively abrogated the common-law privilege to resist an illegal search with force. *Id.* at 103, 583 P.2d at 467. Second, the Supreme Court held that the initial illegality of an arrest without probable cause did not render unlawful the subsequent search of the juvenile suspect by the booking officers, who at the time they were attacked were conducting a search pursuant to routine procedures. *Id.* This point is the Supreme Court's principal holding in *Doe II* and the actual ground upon which that decision rests. Third, the Supreme Court held that whether a peace officer is discharging his duties is to be determined by a standard taken from agency law: the test is whether the [officer] is "acting within the scope of what [he] is employed to do," versus "engaging in a personal frolic of his own." *Id.* (quoting *United States v. Heliczer*, 373 F.2d 241, 245 (2d Cir. 1967) (internal quotation marks omitted)).

**{16}** The Supreme Court's opinion in *Doe II* and our opinion in *Frazier* collectively lead us to the following observations. First, *Doe II* leaves intact *Frazier*'s specific holding that an officer detaining a person without legal authority other than the bare fact of his employment as a peace officer is not "in the lawful discharge of his duties." Second, the statutory requirement that the victim have been a peace officer "in the lawful discharge of his duties" has two components: (1) whether the officer is discharging his duties, and (2) whether the officer's discharge of his duties is lawful. As *Frazier* demonstrates, not every discharge of an officer's duties will be a *lawful* exercise of his duties. Whether an officer is discharging his duties is determined under a test taken from agency law, *Doe II*, 92 N.M. at 103, 583 P.2d at 467; whether an officer is acting lawfully is measured by his actual legal authority, including common-law, statutory, or constitutional limitations on the officer's authority, *Frazier*, 88 N.M. at 104-05, 537 P.2d at 712-13; *Calhoun*, 23 N.M. at 686-87, 170 P. at 751; *Bad Elk*, 177 U.S. at 534-37.

**{17}** On appeal, the State argues that even if Officer Roberts lacked actual legal authority to seize Defendant, he was in the lawful discharge of his duties because he entertained a good faith belief that he had the authority to place Defendant in protective custody and was not engaged in a frolic. The State's argument is based on a misreading of the Supreme Court's opinion in *Doe II*, a reading to which our more recent cases unfortunately may have contributed. Opinions subsequent to *Frazier* and *Doe II* have come perilously close to either

reading the qualifier "lawful" out of the phrase "lawful discharge of his duties," *State v. Nemeth*, 2001-NMCA-029, ¶¶ 51-57, 130 N.M. 261, 23 P.3d 936, *overruled in part by State v. Ryon*, 2005-NMSC-005, 137 N.M. 174, 108 P.3d 1032, or rewriting Section 30-22-24 in the course of construing the words actually enacted by the Legislature, *State v. Tapia*, 2000-NMCA-054, ¶ 13, 129 N.M. 209, 4 P.3d 37 (stating that "lawful discharge of his duties" means "acting in good faith and within the scope of what the officer is employed to do"). Our Legislature enacted the phrase "lawful discharge of his duties," not the phrases "discharge of his duties," or "acting in good faith and within the scope of what he is employed to do," and it did so at a time when *Calhoun* was still good law, Comment, *Right to Resist Unlawful Arrest*, *supra*, at 119, and when only a handful of American jurisdictions criminalized the use of reasonable force in resisting an unauthorized arrest, *see id. Frazier* was decided by a court whose members were contemporaries of the Legislature that enacted Section 30-22-24, and who, we may presume, were familiar with the assumptions of the time, including the 1971 Legislature's understanding of the proper balance between individual rights and the needs of law enforcement. "A statute is to be interpreted as the Legislature understood it at the time it was passed." *Pan Am. Petroleum Corp. v. El Paso Natural Gas Co.*, 82 N.M. 193, 196, 477 P.2d 827, 830 (1970). "A statute must be read and given effect as it is written by the Legislature, not as the court may think it should be or would have been written if the Legislature had envisaged all the problems . . . which might arise in the course of its administration." *Burch v. Foy*, 62 N.M. 219, 223, 308 P.2d 199, 202 (1957).

**{18}**   The State's reading of *Doe II* would require us to attribute to our Supreme Court a disregard for well-established and clearly applicable rules of statutory construction designed to insure that courts respect the expressed will of the Legislature. The Supreme Court's opinion in *Doe II* was a response to our holding that the initial illegality of an arrest without probable cause automatically tainted the otherwise lawful conduct of the booking officers who were conducting a routine intake search of the defendant. In its opinion in *Doe II*, the Supreme Court distinguished *Frazier*; it did not overrule it.

**{19}**   Giving literal effect to "lawful" by limiting the felony offense of battery on a peace officer to scenarios where the peace officer is acting within his actual legal authority does not lead to unreasonable or absurd results. Section 30-22-24 creates a felony offense that did not exist at common law. The 1971 Legislature, its thinking informed by a then still vital common-law tradition of permitting resistance to illegal arrest, easily could have concluded that a person who resists the indignity of an illegal search or seizure is not as culpable as a defendant who resists an officer who is acting lawfully, and therefore should not be subject to conviction for a felony. Furthermore, in view of the Supreme Court's abrogation of the privilege to forcibly resist an illegal search or seizure, construing the term "lawful discharge of his duties" according to the plain meaning of "lawful" does not mean that a defendant who resists an unlawful search or seizure will escape all criminal liability; a defendant who forcibly resists an illegal search or seizure by an officer discharging his duties is acting unlawfully and therefore may be convicted of simple misdemeanor battery. *See State v. Kraul*, 90 N.M. 314, 317, 563 P.2d 108, 111 (Ct. App. 1977) (observing that simple battery

7

is an included offense of battery on a peace officer; holding that the defendant was entitled to an instruction on simple battery "[t]here being evidence that the police officer was not in the lawful discharge of his duties in connection with the altercation"). This approach respects the Legislature's clearly expressed intent in requiring the officer's conduct to have been lawful to justify punishment for the felony offense of battery on a peace officer, while at the same time deferring to the Supreme Court's statement in *Doe II* that forcible resistance to an officer discharging his duties is unlawful regardless of whether or not the officer is acting within his actual legal authority in seizing an individual.

**Was Officer Discharging His Duties?**

**{20}**    Turning to the present case, we apply these interrelated principles. We begin with the question of whether Officer Roberts was discharging his duties. Where an officer is on duty, the officer's conduct must be so unrelated to the performance of his duties as to amount to a "personal frolic of his own" before it will be considered outside the discharge of the officer's duties for purposes of Section 30-22-24. *Doe II*, 92 N.M. at 103, 583 P.2d at 467 (internal quotation marks and citation omitted). In the present case, a reasonable factfinder could conclude that Officer Roberts was not engaged in a personal frolic when he took Defendant into protective custody. A finding that Officer Roberts was discharging his duties when Defendant struck him would also dispose of the issue of the unlawfulness of Defendant's conduct. In view of the substantial evidence that Officer Roberts was discharging his duties as a peace officer when he seized Defendant, a reasonable factfinder could conclude that Defendant acted unlawfully in using force against Officer Roberts, and under *Doe II*, this is so regardless of whether Officer Roberts was acting outside his legal authority in taking Defendant into protective custody. The district court properly denied Defendant's motion to dismiss as to these issues as they present questions of fact for the factfinder that cannot be decided in advance of trial. *See* Rule 5-304(A) NMRA.

**Was Officer's Discharge of Duties Lawful?**

**{21}**    The dispositive question is whether Officer Roberts' discharge of his duties was lawful. Under *Frazier*, Officer Roberts' seizure of Defendant was lawful if Officer Roberts did not exceed his actual legal authority in seizing Defendant. On appeal the State does not argue that Officer Roberts had probable cause to arrest Defendant for a crime when he confined Defendant in the back of his patrol car; rather, the State argues that Officer Roberts had actual authority to seize Defendant and place him in protective custody under the Detoxification Reform Act, Section 43-2-2(B) (the DRA).

**{22}**    There is no dispute that Section 43-2-18(A) of the Detoxification Act, which authorized police to transport an intoxicated person to his home, was repealed effective July 1, 2005, by the same act that enacted the DRA, and therefore was not in effect when Officer Roberts seized Defendant on September 13, 2005. The fact that Officer Roberts subjectively and mistakenly relied on a repealed statute in taking Defendant into protective custody does not mean that his seizure of Defendant necessarily was unlawful. Probable cause is

8

measured by an objective, rather than a subjective, standard; therefore, if the circumstances observed by Officer Roberts would have provided a reasonable officer with probable cause to take Defendant into protective custody under the law in effect on September 13, 2005, we may uphold the seizure notwithstanding Officer Roberts' subjective reliance on a repealed statute. *See State v. Vargas*, 120 N.M. 416, 418-19, 902 P.2d 571, 573-74 (Ct. App. 1995).

**{23}** To establish Officer Roberts' actual authority, the State relies on Section 43-2-8(A) of the DRA, which was in effect on September 13, 2005. Section 43-2-8(A)(2) provides that "[a]n intoxicated . . . person may be committed to a treatment facility at the request of an authorized person for protective custody, if the authorized person has probable cause to believe that the person to be committed . . . is unable to care for the person's own safety." Under the DRA, a police officer is an "authorized person." Section 43-2-2(B). The DRA defines "intoxicated person" as "a person whose mental or physical functioning is substantially impaired as a result of the use of alcohol or drugs." Section 43-2-2(H). Clearly, the information available to Officer Roberts gave him probable cause to believe that Defendant was an "intoxicated person." "Probable cause is not subject to bright line, hard-and-fast rules, but is a fact-based determination made on a case-by-case basis." *State v. Nyce*, 2006-NMSC-026, ¶ 10, 139 N.M. 647, 137 P.3d 587. We are inclined to accord considerable deference to Officer Roberts' first-hand observations of Defendant's behavior. We hold that in view of Officer Roberts' testimony that Defendant was intoxicated to the point that Defendant was stumbling and unable to keep his balance, a reasonable officer in Officer Roberts' position would have had probable cause to believe that Defendant was unable to care for his own safety. Therefore, Officer Roberts had actual authority under the DRA to take Defendant into protective custody by placing him in the back of his patrol car, and Officer Roberts was in the lawful discharge of his duties when he was attacked by Defendant.

## CONCLUSION

**{24}** To summarize, we reject the State's argument that a conviction under Section 30-22-24 can be sustained in the absence of a determination that the officer-victim was acting within his actual legal authority in seizing the defendant. However, because we are satisfied that Officer Roberts had probable cause to believe that Defendant was unable to care for himself, we hold that Officer Roberts was acting within his actual authority under the DRA in taking Defendant into protective custody and placing him in the back seat of his patrol car. We therefore affirm Defendant's conviction.

**{25}** **IT IS SO ORDERED.**

**A. JOSEPH ALARID, Judge**

**I CONCUR:**

RODERICK T. KENNEDY, Judge

CELIA FOY CASTILLO, Judge (specially concurring).

CASTILLO, Judge (specially concurring).

{26}    I concur in the result of the majority opinion, but write separately because I disagree with the application of *Doe II*.  Our Supreme Court held in *Doe II* that "[a]n arrest undertaken without probable cause does not vitiate all the authority of the arresting officer.  Even if an arrest is effected without probable cause, a police officer is engaged in the performance of his official duties if . . . [h]e is simply acting within the scope of what the agent is employed to do." 92 N.M. at 103, 583 P.2d at 467 (internal quotation marks and citation omitted).  From this I conclude that the only necessary inquiry is whether the officer acted within the scope of what he was employed to do.  In my view, the phrase "lawful discharge of his duties" refers to the discharge of an officer's duties as authorized by law and not to whether an officer mistakenly believed he had probable cause or reasonable suspicion.

{27}    A survey of other jurisdictions reveals that many other courts apply the same analysis:  "The test is whether the agent is acting within that compass or is engaging in a personal frolic of his own.  It cannot be said that an agent who has made an arrest loses his official capacity if the arrest is subsequently adjudged to be unlawful." *United States v. Heliczer*, 373 F.2d 241, 245 (2d Cir. 1967); *see State v. Hatton*, 568 P.2d 1040, 1046 (Ariz. 1977) (in banc); *People v. Johnson*, 677 P.2d 424, 425 (Colo. Ct. App. 1983); *State v. Privitera*, 476 A.2d 605, 612 (Conn. App. Ct. 1984), *abrogated on other grounds by State v. Brocuglio*, 826 A.2d 145 (Conn. 2003); *City of Champaign v. Torres*, 803 N.E.2d 971, 973-74 (Ill. App. Ct. 2004), *aff'd*, 824 N.E.2d 624 (Ill. 2005); *Glover v. State*, 594 A.2d 1224, 1230 (Md. Ct. Spec. App. 1991); *State v. Gardiner*, 814 P.2d 568, 574 (Utah 1991); *State v. Barrett*, 291 N.W.2d 498, 500 (Wis. 1980).  There is no dispute that Officer Roberts acted within the scope of his duties, and I would affirm on that basis.

CELIA FOY CASTILLO, Judge

Topic Index for *State v. Phillips, No. 27,019*

CL          Criminal Law
CL-AO       Assault or Battery on a Peace Officer

GV          Government
GV-OF       Officers

ST          Statutes

ST-IP          Statutory Interpretation